[No. S011636. July 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES NELSON BLAIR, Defendant and Appellant.

692

## COUNSEL

David A. Nickerson, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanka, Assistant Attorney General, Sharlene A. Honnaka and Marc J. Nolan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—A jury convicted defendant James Nelson Blair of the first degree murder of Dorothy Green (Pen. Code, § 187)[1] and found true the special circumstance allegation of murder by the administration of poison. (§ 190.2, subd. (a)(19).) At the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed a death sentence.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

Defendant was convicted of the first degree murder of his neighbor Dorothy Green by the administration of poison. The prosecution's evidence showed that, in 1984, defendant deliberately poisoned Green and Green's friend, Rhoda Miller, by placing cyanide in a gin bottle and giving the bottle to Miller to deliver to Green. The apparent motive was to obtain money that defendant believed was owed to him by Green. Green drank more of the gin than Miller, fell into a coma that lasted for several months, and sustained brain damage. Green survived for almost two years and then died from pneumonia in 1986. Medical experts testified that the cyanide poisoning caused the brain damage, which then caused the pneumonia that led to Green's death.

Defendant was tried in 1985 for the attempted murder of Green and Miller. He represented himself and was convicted. After Green died, he was tried in the present case for the first degree murder of Green with the special circumstance of murder by the administration of poison. Defendant insisted on representing himself, as he had in the earlier proceedings. He attempted, unsuccessfully, to establish that cyanide poisoning was not the cause of Green's death. At the penalty phase, the prosecution's evidence in aggravation consisted principally of proof of defendant's prior convictions, and defendant presented no witnesses and only a few college transcripts as evidence in mitigation.

### A. Guilt phase

#### 1. The prosecution's case

##### a. The poisoning

In 1984, defendant lived in an apartment complex located at 5542 Sierra Vista Avenue in Hollywood. Dorothy Green shared apartment 209 in the same complex with a man named Goretha Murphy. One evening, a man whom Murphy believed was defendant came to their apartment. After Murphy let the man in, Murphy overheard the man tell Green that he wanted his money back and was going to get it. The man then left. On another occasion, the same man approached Murphy and told him that he had "better do something" about having Green return the money. Murphy then heard this man tell another

person that he was going to "get" Green and Murphy. This led to a scuffle between Murphy and the man on the walkway near Green's apartment.

On September 24, 1984, Rhoda Faye Miller, a former resident of the Sierra Vista apartment complex, and her eight-year-old son, William, went to visit Michelle Dubois in apartment 203.[2] Defendant was at Dubois's apartment when Miller and her son arrived. Defendant had a briefcase with him. After a while, Miller went to a store and returned with some food, soda, and a pint of rum. Miller, Dubois, and defendant consumed drinks of rum and cola.

About 40 minutes after Miller returned, defendant asked to speak with her privately in the kitchen. There, defendant asked Miller to do him a favor by delivering to Dorothy Green a tall box wrapped in butcher paper and a ribbon, which he explained contained a bottle of gin. Defendant said he did not want to deliver the package himself, because Green's "husband," Murphy, did not like them drinking together. Miller agreed and left Dubois's apartment with the package, leaving William and defendant with Dubois.

When Miller arrived at Green's apartment, she told Green that she had brought a bottle of gin as a gift from defendant. Green said "how nice," and invited Miller in for a drink. Once Miller was inside, Green took the bottle out of the box. To Miller, the seal on the cap of the bottle appeared to be intact, except for one spot that was not completely sealed. When Green opened the bottle, it made a "swish" sound as if it had been sealed. Green poured a six-to-eight-ounce glass of gin for herself. Miller put about two inches of gin into her own glass and mixed it with water.

Green then drank her full glass of gin straight down, immediately said the gin did not "taste right," and asked where defendant was. Miller took a swallow from her own glass. Miller thought the gin tasted like kerosene. As Green was returning from her bedroom, where she had gone to get her slippers, she began to fall. Miller caught her so she would not hit her head, and then Miller herself began to feel woozy. Both of them fell to the floor. Green was vomiting, so Miller turned her on her side to prevent her from choking, then called the paramedics, and told them she believed she and Green had been poisoned.

Meanwhile, Dubois sent Miller's young son, William, to Green's apartment to look for Miller. William and defendant left Dubois's apartment at the same time; as William headed to Green's apartment, defendant left the complex. When William arrived at Green's apartment, he saw Miller on her knees by

---

[2] Dubois died in 1985, before defendant's murder trial.

the telephone and Green lying on the floor on her side, barely moving. Miller told William to return to Dubois and tell her that she and Green had been poisoned. Miller then passed out.

When Miller regained consciousness, several paramedics were in the apartment. Miller told one of the paramedics, Robert Miller (who was no relation), that she and Green had drunk some gin, and that possibly the gin had been poisoned. It appeared to Robert Miller that Green was in a more serious condition than Miller. Green was unconscious and "critical." The paramedics inserted an "I.V." into Green's arm and took her, Miller, and the gin bottle (which they had found in the apartment) to Hollywood Presbyterian Hospital. At the hospital, the paramedics gave the gin bottle to the police. Later tests of samples of gin from the bottle revealed that it contained sodium cyanide, at a quantity of 5 percent of the solid material.

### b. *Defendant's arrest*

A few days after the poisoning incident, William was playing with some friends outside the Sierra Vista apartment complex. He saw defendant, who was carrying the same briefcase that was in his possession on the day of the poisoning. Defendant asked William where his mother was.

Officer Keith Moreland arrested defendant at the Sierra Vista apartment complex on October 2, 1984. At the time of his arrest, defendant was carrying a briefcase. Officer Moreland took defendant to the Hollywood police station and turned him and the briefcase over to the investigating officer, Detective Richard Jackson, and his partner, Detective Michael Thrasher.

In an interview room, Detective Jackson searched the briefcase. Inside, he found an envelope with writing on it. Among such entries as "magic shave," "soap," and "Reader's Digest law book" were the words "get cyanide." Detective Jackson also searched defendant's wallet and found several items, including: (1) a piece of paper with "Chem Lab Supply" and a telephone number and address written on it; (2) another piece of paper with "RJM Lab," "Chem Lab Supplies," and corresponding addresses and phone numbers written on it; (3) and a business card with "Chem Lab" and "Haw" written on it. Detectives Jackson and Thrasher later visited Chem Lab Supply and RJM Lab in Hawthorne, but no one there recognized a photo of defendant as someone who had purchased cyanide.

On October 3, 1984, Miller, who had been released from the hospital, identified defendant from a photo lineup as the person who had handed her the gin bottle to give to Green.

A police handwriting analyst compared the writing on the envelope found in defendant's briefcase with handwriting exemplars taken from defendant on the day of his arrest in October 1984, in October 1986, and again in April 1989.[3] The analyst was able to state that the writing on the envelope matched that of the first and third of defendant's exemplars, but not the second. The analyst testified that the handwriting in the second exemplar had been "disguised," that is, the person giving the exemplar had attempted to change the characteristics of the writing.

### c. *Green's illness and death*

Meanwhile, Green remained at Hollywood Presbyterian Hospital. When first admitted she was in a coma and unable to breathe, with a blood pressure reading as low as 33, indicating shock. This condition had to be reversed immediately to avoid death. An intratracheal tube was placed in her throat, and a machine helped her breathe for the first few days. When she regained the ability to breathe on her own, a tracheotomy was performed so that a tube could be placed directly in her trachea, bypassing her nose and throat. Without breathing assistance, she would have died. Toxicology screens performed on Green's blood and urine when she was admitted to the hospital revealed the presence of cyanide, as well as amphetamine and Valium.

Green remained in a coma for approximately three months. She was fed and medicated through tubes connected to her nose and stomach. During that time, she developed pneumonia, a common complication for patients in her condition. When she awakened from the coma briefly, she showed signs of mental impairment.

Dr. Henri Becker, a specialist in the critical care of patients whose lives are in danger due to heart attack or other trauma, participated in Green's care at Hollywood Presbyterian and reviewed her medical records. Dr. Becker explained that cyanide causes brain damage by binding with hemoglobin to prevent the transport of oxygen to the brain and other tissues. In Dr. Becker's opinion, Green's ingestion of cyanide caused her coma and the resulting complications.

Green's daughter, Caron Green, had seen her mother regularly before the poisoning, when Green was in excellent health. Caron visited Green frequently while Green was at Hollywood Presbyterian. For about the first three months, Caron could not speak to Green because of the coma. When Green came out of the coma, she could not see and did not have control of her bodily functions.

---

[3] The original exemplar taken in 1984 was lost during defendant's trial on the attempted murder charges.

After several months, Green was transferred to Glendale Adventist Hospital. Caron continued to see her mother regularly. Green was unable to walk, see, converse, or feed herself. Later, she was moved to a hospital in Michigan, where her other daughters lived. Her condition steadily deteriorated, and she died on July 26, 1986.

Dr. Jerry Gray, a pathologist, performed an autopsy on Green. Green died from another bout of pneumonia attributed to "toxic brain damage" caused by the cyanide poisoning. The cyanide prevented oxygen from reaching Green's brain, thus killing her brain cells. Dr. Gray testified that pneumonia is common after this type of brain injury because the patient cannot breathe and cough normally and therefore cannot tolerate secretions in the lungs.

### 2. The defense case

Acting as his own counsel, defendant re-called Detective Jackson, who testified that he never had spoken to Green's daughter Caron. Dell Freeman, a fingerprint expert, compared defendant's fingerprints to photographs of fingerprints taken from the gin bottle, the gift box, and the wrapping paper. Freeman could not identify the prints on the bottle as defendant's.

Dr. Mohamad Abdel Latif, the director of the intensive care unit at Hollywood Presbyterian Hospital, treated Green on September 24, 1984, the day she was admitted. In Green's stomach, Dr. Latif found Darvon, the drug Atropine, and bleach. These three substances could cause brain damage or respiratory arrest if they reached the bloodstream in significant amounts, but blood tests indicated they had not. Alcohol at a level of 0.123, as well as Valium and amphetamine, were found in Green's blood. Dr. Latif testified that theoretically, the combination of alcohol, amphetamine, Valium, and bleach could cause respiratory arrest and brain damage. On cross-examination, however, he agreed that the most likely cause of Green's condition upon her arrival was cyanide poisoning. The cyanide level in Green's blood 16 hours after her admission to the hospital was 20 micrograms per milliliter, an "extremely high" amount.

Dr. Hideo Itabashi, a neuropathologist employed by the County of Los Angeles, without having read any of Green's medical records or the autopsy report, testified that theoretically a combination of alcohol, Darvon, and Valium in significantly high amounts in a person's blood could cause respiratory arrest leading to hypoxia and brain damage. Cyanide poisoning also could cause such hypoxia. Dr. Itabashi testified that a physician examining a patient could not distinguish between hypoxia caused by cyanide and hypoxia caused by Darvon, Valium, and alcohol. He was aware that Green had a blood-alcohol level of 0.123, but was not told the amounts of the other drugs that were present. He could not say what had caused Green's death.

### 3. *The prosecution's rebuttal*

Dr. Irving Root, a pathologist who had conducted approximately 20,000 autopsies, reviewed Green's medical records and autopsy report. In his expert opinion, Green died from complications of cyanide poisoning—that is, pneumonia resulting from brain damage caused by cyanide. The amount of cyanide in Green's blood, 20 micrograms per milliliter, was an extremely high level and normally would cause a very quick death, absent immediate resuscitation. In Green's case, Dr. Root explained, emergency personnel resuscitated Green in time to keep her alive, but not soon enough to avoid the brain damage that eventually caused her death.

### B. *Penalty phase*

#### 1. *The prosecution's case*

Defendant was convicted of first degree robbery and assault with a deadly weapon in Orange County in 1959. In 1963, defendant was convicted of second degree robbery in San Bernardino County. Defendant was incarcerated for these offenses. In 1985, defendant was convicted of the attempted murder of Green and Miller.

Over defendant's objection, Emily Maverick, a professor of chemistry at Los Angeles City College (formerly Los Angeles Community College), testified concerning an experiment involving cyanide that defendant had conducted when he was a student in one of her chemistry classes in 1982.

#### 2. *The defense case*

Still acting as his own counsel, defendant called no penalty phase witnesses in mitigation. The parties stipulated to the admission in evidence of defendant's academic records from Los Angeles City College.

## II. Discussion

### A. *Competency and self-representation issues*

#### 1. *Knowing and intelligent waiver*

Defendant contends the trial court erred in permitting him to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*) without, he asserts, obtaining a knowing and intelligent waiver of his right to the assistance of counsel under the Sixth Amendment to the United States Constitution.

### a. *Facts*

At his trial for the attempted murder of Green and Miller, defendant moved for permission to represent himself. The court, Judge Clarence A. Stromwall presiding, orally quizzed defendant concerning his knowledge of the charges, the possible penalties, and courtroom procedures, warning defendant of the pitfalls of self-representation and informing him that he would be "prosecuted by a professional prosecutor." The court cautioned defendant: "How would you like to get into the [boxing] ring with Joe L[ou]is in his h[e]yday? . . . [T]hat's what you're asking to do."[4] Ultimately, the court granted defendant's request, and defendant represented himself through trial and in posttrial proceedings following the guilty verdict.

Shortly after defendant's conviction was affirmed on appeal in June of 1986,[5] Green died, and defendant was charged with her murder. On September 19, 1986, defendant appeared with counsel for arraignment in the municipal courtroom of Judge Glenette Blackwell. Defendant soon indicated that he wished to represent himself. The court warned defendant: "Sir, the State is asking for your life. I think you need all the help you can get. It's always unwise to represent yourself. I don't know if you do your own medical surgery. I don't think that would be wise. I read the report on you. I don't think you have that type of educational background, but you can think about it, fill out the appropriate form."

The court then gave defendant a written "Pro. Per. Advisement Form" to complete. On the form, defendant wrote that he had completed 12 years of education. Defendant also responded to nine questions asking whether he understood his rights as a defendant and the responsibilities he would be undertaking as his own attorney.[6] Although the form instructed defendant to

---

[4] The transcript of the trial in the attempted murder case was made part of the record in this appeal.

[5] We granted respondent's request for judicial notice of the June 26, 1986, unpublished opinion of the Second District Court of Appeal in case No. B016044, affirming defendant's conviction for the attempted murder of Green and Miller in the Los Angeles County Superior Court, case No. A-757679. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[6] Specifically, the form required a yes or no response to the following questions: "1. Do you understand that you have a right to have a lawyer of your choice, and that if you cannot afford a lawyer the Court will appoint one to represent you at no charge to you? 2. Do you understand that that the Public Defender is a lawyer who must have the same qualifications and education as any other attorney? 3. Do you know that you will receive no special consideration or treatment by the Court because you have chosen to represent yourself? 4. Do you know that the prosecutor is an experienced lawyer and will have an advantage over you at trial? 5. Do you understand that you will be expected to follow all rules of evidence and procedure just as if you were an attorney? 6. Do you understand that there are pre-trial motions that may be filed in your case? 7. Do you know what things must be proved in Court before you can be found guilty of the offense charged? 8. Do you know what the legal defenses are to the charge against

place his initials in the "yes" or "no" column in response to each question, defendant instead placed an "x" in each box in the "yes" column. Defendant also placed an "x" in the "yes" column next to the question "Understanding all that you have read here, and all that the Court has told you, do you still wish to give up your right to have an attorney, and to represent yourself?"

When defendant returned to court with the form, Judge Blackwell stated: "Sir, let me ask you. I have your pro. per. form filled out here. Do you understand that in your case that the prosecutor is an experienced lawyer and possibly may have an advantage over you? Do you understand that?" Defendant responded in the affirmative and also stated he understood it was unwise to represent himself. The court then denied defendant's request for self-representation on the ground that defendant's responses on the Pro. Per. Advisement Form, where he had marked an "x" instead of placing his initials, indicated he could not read and understand simple English. Although the court stressed to defendant that this was a special circumstances case in which the state was asking for his life, defendant refused to waive time. The court then entered a not guilty plea on defendant's behalf and set the preliminary hearing for October 1, 1986.

On October 1, 1986, defendant appeared with a deputy public defender before another municipal court judge, Judge Xenophon F. Lang. Counsel told the court that defendant wished to represent himself, explaining that defendant had represented himself at the earlier trial. Judge Lang stated: "I see that Judge Blackwell, in Division 30, had Mr. Blair fill out a form and she still denied the motion; however, I don't think that those questions are necessary now. They were several years ago; but in the last several years, if the defendant wants to represent himself, he has a perfect right to do so. Isn't that your understanding?" The prosecutor agreed that defendant had an "absolute right" to represent himself "if he meets the basic criteria of *Faretta*," and reminded the court that defendant had represented himself in the previous jury trial. The court then stated: "The public defender is relieved," and continued the preliminary hearing until October 3, 1986, to give defendant time to prepare.

Defendant appeared in propria persona for the preliminary hearing in municipal court on October 3, 1986, before Judge Ronald S. Coen. At the beginning of the hearing, the following exchange occurred:

"The Court: You are representing yourself?

"[Defendant]: Yes.

you? 9. Do you understand that you cannot later come back to Court and say 'I should have had a lawyer', or 'I did not do a good job of representing myself'?"

"The Court: You have been told earlier, I take it, the pain and pitfalls of self-representation and the warnings about it?

"[Defendant]: Yes.

"The Court: Is it still your desire to represent yourself?

"[Defendant]: Yes.

"The Court: Very well."

The court then read defendant a statement of rights, which included the following: "You have the right to be represented by an attorney at all phases of the proceedings. At this time you have chosen to represent yourself. You have been granted that right." Defendant indicated he understood his rights. Thereafter, defendant represented himself throughout the preliminary hearing, at the end of which he was held to answer on the capital murder charges.

Defendant appeared for his arraignment in the superior court before Judge Aurelio Munoz on October 21, 1986. Judge Munoz stated that he was aware defendant was representing himself, and asked defendant whether he wanted to be represented by an attorney, to which defendant answered: "No. No, I don't, your honor." When the court noted that this was a "death case," the prosecutor stated that a final decision concerning whether the death penalty would be sought had not yet been made. The court stated: "I'm not going to let somebody walk into a death case pro. per. without making very sure that we aren't going to be trying this case again." The prosecutor replied: "We have had three hearings on this already and I understand the court's concern." The court then had defendant fill out another, more extensive form, entitled "Petition to Proceed in Propria Persona."

On this form, defendant stated that he could read and write; that he understood his constitutional rights to a speedy and public jury trial, to compulsory process, to confrontation and cross-examination, to testify or refuse to testify, to bail, and to appointed counsel; that he understood that if he was permitted to represent himself, he would be giving up his right to be represented by counsel and would have to conduct his own defense; that he was a high school graduate; that he understood that by representing himself he would be giving up the right to the assistance of an experienced public defender; that he would have to "follow all of the many technical rules of substantive law, criminal procedure, and evidence"; that he would not be entitled to any special consideration from the court; and that the district attorney would be experienced in both court and jury trials. Defendant correctly identified the charge against him, stated that the crime was a

specific intent crime, and acknowledged that if he represented himself it would be necessary for him to handle all pretrial motions, plea negotiations, jury selection, opening and closing statements, presentation and cross-examination of witnesses, objections, and motions. Defendant further acknowledged that he understood he would have to participate in the formulation of jury instructions, conduct any necessary penalty phase, and prepare and submit posttrial motions. On several places on the form defendant correctly noted that the possible penalties included the death penalty. Finally, defendant acknowledged that the form would become part of the case file and would be considered by an appellate court in determining whether he had knowingly and intelligently waived his right to counsel, and that by acting as his own lawyer he was giving up any possible claim of ineffective assistance of trial counsel.

When defendant returned to court later in the day, the following exchange occurred:

"The Court: Now, the People are deciding if this is a death penalty. Okay. [¶] Do you understand, of course, that you are not going to get any breaks or any help simply because you are a layman? You are aware of that?

"[Defendant]: I understand that.

"The Court: And there is a saying in the law 'that a lawyer who tries his own case has a fool for a client.'

"[Defendant]: I have heard that.

"The Court: Do you know what it means?

"[Defendant]: I heard that before.

"The Court: Do you know what it means?

"[Defendant]: Do I know what it means?

"The Court: Yes. What it means, you can't be objective when you are trying your own case. And a lawyer's job, above all, is to be objective. And that's one of the dangers. [¶] Do you understand that?

"[Defendant]: Yes."

Then, after ascertaining that defendant had been represented by lawyers previously, had had troubled relationships with each, and did not want a

lawyer now, the court stated: "All right. I'll allow the defendant to proceed in pro. per. He did fill out the pro. per. petition. Apparently he has represented himself before in this identical case. So you may arraign the defendant."

Judge Munoz arraigned defendant a few days later, on November 4, 1986. When the prosecutor informed the court that the prosecution would be seeking the death penalty, the following exchange took place:

"The Court: Okay. Mr. Blair, I know you were representing yourself pro. per. in the previous trials . . . . [¶] Okay. It's one thing to represent yourself at a trial. At this point, the stakes have just gone up quite a bit. Now, you are a layman, and you really need a lawyer. It's your life. [¶] I'll guarantee one thing. The way things are going now, just based upon what I've seen and heard this morning, you're going to lose that life. Now, I'm not denying you the right to be your own counsel. I'm not denying you appointed counsel. I'm not denying you anything. I'm telling you you have the right to have one. [¶] So you're not going to be able to go up and say that you were denied counsel. You are not going to be able to go up and say that you were ineffective. Now, don't you really think you ought to reconsider your decision to proceed in pro. per.?

"[Defendant]: No, your honor. I want to go pro. per. It's my decision.

"The Court: Would you like to have advisory counsel?

"[Defendant]: No.

"The Court: You realize, of course, you will get no special consideration from the court. And chances are it's going to be somebody just like me sentencing you to death. I'm being realistic. Do you understand, sir?

"[Defendant]: Yes, I understand."

Later, in the same hearing, Judge Munoz inquired again whether defendant wanted advisory or associate counsel. When defendant said he did not, the court stated: "All right. It's your life. I will state for the record that I think Mr. Blair is making a conscious choice. He appears to be in full control of his faculties. [¶] I think it's probably a game that he's hoping that even if he does get the death penalty, that some court is going to look at this and say it isn't fair."

Later that same day, defendant indicated that he wished to have Attorney Ray Newman appointed as "associate counsel." Newman appeared in the courtroom, and after ascertaining his availability, Judge Munoz appointed him

as "associate counsel" and "standby counsel." After it became clear that Newman would be unable to attend all court sessions during the trial, the trial judge, Judge Jerold A. Krieger, appointed Lonzo Lucas as defendant's additional advisory counsel.

### b. *Discussion*

■ A criminal defendant has a right, under the Sixth Amendment to the federal Constitution, to conduct his own defense, provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel. (*Faretta, supra,* 422 U.S. at pp. 835–836; *People v. Bradford* (1997) 15 Cal.4th 1229, 1363 [65 Cal.Rptr.2d 145, 939 P.2d 259].) A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." (*Faretta, supra,* 422 U.S. at p. 835.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 [119 Cal.Rptr.2d 859, 46 P.3d 335].) Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Ibid.*; accord, *People v. Lawley* (2002) 27 Cal.4th 102, 140 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Marshall* (1997) 15 Cal.4th 1, 24 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Here, the record is replete with instances in which defendant was warned of the dangers and disadvantages of self-representation, both orally and in writing, in both the municipal and superior courts. For example, defendant was orally warned that representing himself was unwise, that the prosecutor was an experienced lawyer who would have an advantage over him, that as an in propria persona defendant he would receive no special consideration from the court, that he would be unable to claim ineffective assistance of counsel on appeal, that as his own attorney it would be difficult to be objective, and that a death penalty case involved special risks. These oral advisements sufficed to apprise defendant of the dangers and disadvantages of self-representation.

Further, defendant in writing expressed his understanding, on the "Pro. Per. Advisement Form" and "Petition to Proceed in Propria Persona," of the charge against him and the possible penalties, including death. He further acknowledged, in writing, that he would have to handle pretrial, trial, and many posttrial matters himself without the assistance of an attorney, and that he would have to comply with all substantive and procedural rules, which

could be quite technical. He thus demonstrated an understanding of the risks and complexities of his case.[7]

That these latter warnings and understanding were expressed only in writing makes no difference in our determination. (Cf. *People v. Marshall, supra,* 15 Cal.4th at p. 24.) The Los Angeles County Superior Court's in propria persona advisement form (sometimes referred to as a *Faretta* form) serves as "a means by which the judge and the defendant seeking self-representation may have a meaningful dialogue concerning the dangers and responsibilities of self-representation." (*People v. Silfa* (2001) 88 Cal.App.4th 1311, 1322 [106 Cal.Rptr.2d 761].) The court might query the defendant orally about his responses on the form, to create a clear record of the defendant's knowing and voluntary waiver of counsel. (Cf. *People v. Koontz, supra,* 27 Cal.4th at p. 1071.) The failure to do so, however, does not necessarily invalidate defendant's waiver, particularly when, as here, we have no indication that defendant failed to understand what he was reading and signing. To the contrary, defendant demonstrated his ability to read and write in numerous pro se filings before the court. Defendant also appeared to be of at least normal intelligence and spoke articulately in court. The last superior court judge who considered defendant's request for self-representation, Judge Munoz, found that defendant was "in full control of his faculties" and was making "a conscious choice." We have no reason to question these findings.

In sum, the record as a whole reflects that defendant was familiar both with the facts and the difficulties of his particular case and with the risks he faced in representing himself against an experienced prosecutor in a capital case. He demonstrated considerable legal knowledge, and had represented himself at his previous trial on the attempted murder charges involving the same underlying events. These facts support the conclusion that defendant understood the *Faretta* warnings. (See *People v. Lawley, supra,* 27 Cal.4th at p. 142 [relying in part on the defendant's experience in prior trials to find his waiver knowing and intelligent].) Under the circumstances, we have no difficulty in concluding that defendant's waiver of counsel was knowing and intelligent.

Defendant contends nonetheless that no judge in either the municipal court or the superior court conducted the kind of "searching inquiry" that is required to support a valid waiver of counsel. He claims that no court inquired whether he understood the nature of the charged offense, including the grave risk arising from the special circumstance allegation, or the nature of a capital proceeding, including the possibility of a separate penalty phase.

---

[7] Defendant left blank the part of the "Petition to Proceed in Propria Persona" asking about his awareness of possible defenses. Although the court might have queried defendant concerning his understanding of potential defenses, the failure to do so does not invalidate defendant's waiver.

But defendant stated on the "Petition to Proceed in Propria Persona" that he understood that he was being charged with special circumstances murder under section 190.2, subdivision (a)(19) (murder by the administration of poison), that death was a possible penalty, and that if he continued to represent himself he would be required to handle any separate penalty phase. Further, both Judge Blackwell and Judge Munoz warned defendant that a death penalty case requires the expertise of a lawyer. Judge Blackwell told defendant: "Sir, the State is asking for your life. I think you need all the help you can get." And after the prosecution announced its decision to seek the death penalty, Judge Munoz told defendant: "At this point, the stakes have just gone up quite a bit. Now, you are a layman, and you really need a lawyer. It's your life." No more was required. (Cf. *People v. Lawley, supra,* 27 Cal.4th at p. 142 [defendant's waiver knowing and intelligent even though court did not advise him regarding the possibility of a second phase of the trial to determine penalty].)

Defendant further argues that the court made no attempt to determine whether he understood there would be limitations on his ability to investigate defenses and arrange for the assistance of experts. But again, we have rejected contentions that such detailed advisements are necessary. (*People v. Koontz, supra,* 27 Cal.4th at pp. 1072–1073 [failure to advise defendant regarding restrictions on library privileges and investigations did not vitiate waiver]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1042 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [noting lack of authority for defendant's claim that trial court must advise a defendant seeking in propria persona status "of each limitation upon his ability to act effectively as counsel that will flow from security concerns and facility limitations"].) Further, as discussed more fully below, defendant received library privileges as well as the services of investigators, a legal "runner," and experts. Nothing in the record suggests that defendant's decision to proceed in propria persona depended on his understanding of his library privileges or his ability to consult with experts. (See *People v. Koontz, supra,* 27 Cal.4th at p. 1073; *People v. Jenkins, supra,* 22 Cal.4th at p. 1042.)

### 2. *Trial court's failure to declare a doubt concerning defendant's competence to waive counsel*

Defendant contends that his Fifth, Sixth, and Fourteenth Amendment rights to the assistance of counsel and to due process and a fair trial, as well as his rights under state statutory law, were violated when, at two points in these proceedings, the trial court failed to declare a doubt concerning defendant's competence to waive his right to counsel and failed to conduct a hearing into defendant's competency. First, defendant contends that Judge Henry P. Nelson (who had presided over his trial in the attempted murder case, and who briefly presided during pretrial proceedings in the present case) should

have declared a doubt concerning defendant's competence, based solely on knowledge about defendant that Judge Nelson had gained during the attempted murder trial. Second, defendant contends that the judge who presided at the trial under present review, Judge Jerold A. Krieger, should have declared a doubt when, during proceedings that occurred between the guilt and penalty phases, defendant's advisory counsel, Newman and Lucas, questioned defendant's competence. As we shall explain, we reject both contentions.

■ Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law require a trial judge to suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. (§§ 1367, 1368; *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Welch* (1999) 20 Cal.4th 701, 737–738 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Failure to declare a doubt and to conduct a competency hearing when there is substantial evidence of incompetence requires reversal of the judgment. (*Ibid.*)

■ Whether the question for the trial court is competence to stand trial or competence to waive counsel and represent oneself, the competence standard is the same: the defendant must have a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as [a] factual understanding of the proceedings against him.' " (*Dusky v. United States* (1964) 362 U.S. 402, 402 [4 L.Ed.2d 824, 80 S.Ct. 788]; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399–400 [125 L.Ed.2d 321, 113 S.Ct. 2680]; *People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].) The focus of the inquiry is the defendant's mental capacity to understand the nature and purpose of the proceedings against him or her. (*Godinez v. Moran, supra,* 509 U.S. at p. 401, fn. 12; *People v. Koontz, supra,* 27 Cal.4th at p. 1069.) The defendant's " 'technical legal knowledge' " is irrelevant. (*People v. Bradford, supra,* 15 Cal.4th at p. 1364, quoting *Faretta, supra,* 422 U.S. at p. 834.)

> a. *Judge Nelson's failure during pretrial proceedings to declare a doubt concerning defendant's competence and to conduct a competency hearing*

As mentioned above, defendant premises his first claim that the court erred in failing to declare a doubt about his competence to waive his right to counsel solely on knowledge concerning defendant that Judge Henry P. Nelson, who briefly presided over pretrial proceedings in this case long after

defendant had been granted the right to represent himself, had gained during defendant's earlier trial on the attempted murder charges.[8]

Judge Nelson presided over defendant's 1985 trial for the attempted murders of Green and Miller. After the jury found defendant guilty on both counts in that case, but before defendant's sentencing, Judge Nelson received and reviewed a probation report.[9] The report discussed defendant's employment history (none) and military service (he was discharged for being absent without leave (AWOL) on an excessive number of occasions), and noted that in 1972 in Riverside County defendant was "arrested by the sheriff's office in regards to a 'sanity hearing.'" The probation report also stated: "During that same year defendant was a patient at Atascadero State Hospital from March until July for 1026 Penal Code—Forgery—Steal car."[10]

At the sentencing hearing on August 16, 1985, Judge Nelson remarked that he believed the maximum available sentence of 14 years four months was too lenient for defendant's crimes. Judge Nelson explained:

"Apparently you are what is called in the trade a psychopath, Mr. Blair. In other words, you just don't have any kind of human feelings for anybody else. That's apparently your situation now.

"There's some indication that you've had some previous bouts with psychiatric disability, and that's not surprising.

"You're 45 years old, and by your own statement you've never held a permanent job in your life, and apparently you were fooling around doing some studying on student loans. Apparently did some flitting around at some school.

---

[8] Defendant phrases this claim in terms of Judge Nelson's failure to "conduct an inquiry" into defendant's competence to waive counsel. Any duty under state or federal law to conduct such an inquiry or a hearing into a defendant's competence arises, however, only if the trial court is presented with substantial evidence raising a reasonable doubt as to the defendant's competence. (§§ 1367, 1368; *Drope v. Missouri, supra,* 420 U.S. at p. 181; *Pate v. Robinson, supra,* 383 U.S. at pp. 384–386; *People v. Welch, supra,* 20 Cal.4th at pp. 737–738.) We therefore shall consider defendant's contention as a claim that Judge Nelson erroneously failed to declare a doubt and to hold a hearing regarding defendant's competence to stand trial.

[9] We granted defendant's request for judicial notice of the probation report in the attempted murder case, Los Angeles County Superior Court case No. A-757679. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

We have received and reviewed certified copies of both the probation report and the opinion of the Court of Appeal in the attempted murder case. (See fn. 5, *ante.*)

[10] Section 1026 provides for the confinement in a "state hospital for the care and treatment of the mentally disordered" of any person who is found legally insane in a criminal proceeding. (§ 1026, subd. (a).) Atascadero State Hospital is one such hospital for the care and treatment of mentally disordered criminal offenders. (See Stats. 1982, ch. 1549, § 37, p. 6045.)

"Apparently the military, the Marine Corps discharged you, and according to you, for too many [AWOL's]. So maximum sentence in this case is not enough. [¶] . . . [¶]

"You, who ruined one woman's life, put her in a vegetative state, ruined another woman, the most you can get is 14 years and 4 months . . . .

"But all this is just a joke to you, and I can see that's true. Because, as I say, that's your problem."

Judge Nelson then imposed the maximum sentence.

Nearly two years later, as a result of defendant's statutory peremptory challenge (see Code Civ. Proc., § 170.6) to the judge then presiding, Judge Roger W. Boren, the present capital case was assigned to Judge Nelson for a brief period beginning on May 1, 1987. As described in the previous part, defendant had been representing himself since October 1986, having been questioned and admonished by various judges regarding his self-representation. In an answer to a challenge for cause filed against him by defendant, Judge Nelson acknowledged having expressed "regret" during the attempted murder sentencing "that the sentence could not have been longer, since the evidence indicated a cold, calculated attempt to kill one woman, and almost causing the death of another woman through that attempt. The Defendant's actions, as well as his demeanor before me (he secreted an exhibit into the holding tank and flushed it down the drain), indicate a dangerous psychopath, and I did say so."

Some time later that summer, Judge Nelson was reassigned to another department. During the brief period Judge Nelson presided over this case, the issue of defendant's competence to waive counsel or to represent himself never arose. Judge Nelson did not preside over any further proceedings in this case.

Defendant contends that because Judge Nelson had presided over defendant's attempted murder trial in 1985, he was aware in 1987—when he was assigned to this capital case—of facts that should have raised a bona fide doubt in his mind whether defendant was competent to waive counsel and represent himself in the capital trial. Therefore, defendant claims, Judge Nelson erred in failing to declare a doubt concerning defendant's competence and to conduct a competency hearing in 1987. Defendant observes that Judge Nelson was aware, from the probation report in the attempted murder case, that defendant had been (1) found insane in a criminal proceeding in 1972 and confined to Atascadero State Hospital for several months; (2) unable to hold a job during his adult life; and (3) discharged from the military for being AWOL on an excessive number of occasions.

We disagree that the foregoing amounted to substantial evidence that defendant was incompetent to waive counsel at the time of the capital trial. Nothing about defendant's discharge from the military or his inability to hold a job indicated that he did not have the mental " 'capacity to understand the nature and object of the proceedings against him.' " (*Godinez v. Moran, supra,* 509 U.S. at p. 401, fn. 12; see also *People v. Koontz, supra,* 27 Cal.4th at p. 1068 [evidence of defendant's inability to " 'function socially' " was not substantial evidence of defendant's incompetence to stand trial, to waive counsel, or to represent himself].)

Similarly, the evidence of defendant's possible mental instability did not amount to substantial evidence of incompetence to waive counsel at the time of the capital trial. Defendant's confinement at Atascadero State Hospital in 1972 suggested that he might have been suffering from a mental illness at that time, and Judge Nelson noted that defendant appeared to have had "previous bouts with psychiatric disability." The Atascadero confinement was in 1972, however, 12 years before the present crimes took place, and there was nothing in the record of this case pertaining to the period between 1972 and 1987 to indicate that defendant might be mentally ill at the time of the capital trial. (See *People v. Stewart, supra,* 33 Cal.4th at pp. 516–517.)

■ Moreover, even a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt concerning a defendant's competence and to conduct a hearing on that issue. (See, e.g., *People v. Ramos* (2004) 34 Cal.4th 494, 508 [21 Cal.Rptr.3d 575, 101 P.3d 478] [defendant must exhibit more than a preexisting psychiatric condition to be entitled to a competency hearing].) We have found that evidence of more serious mental disturbances than defendant displayed did not amount to substantial evidence of incompetence requiring a competency hearing. (See, e.g., *People v. Ramos, supra,* 34 Cal.4th at pp. 508–511 [defendant's death wish, history of psychiatric treatment, planned suicide attempt, propensity for violence, and psychiatric testimony that defendant was physically abused as a child and suffered from a paranoid personality disorder did not constitute substantial evidence of incompetence requiring court to conduct a competency hearing].) Here, the circumstance that defendant had been found insane in a criminal proceeding and had been confined to a mental hospital for an unspecified period approximately 15 years prior to the present trial, without more, was insufficient to compel a doubt whether defendant had the mental capacity to understand the proceedings against him in the current prosecution.

Nor did Judge Nelson's 1985 statement that defendant was a "psychopath" indicate that Judge Nelson entertained or should have entertained a doubt

concerning defendant's competence in 1987. Defendant notes that one definition of "psychopath" is "a mentally ill or unstable person." Thus, he contends, Judge Nelson must have recognized that defendant was mentally ill.

We disagree. The term "psychopath" (or "sociopath") commonly is used to describe individuals with "antisocial personality disorder," defined as "a pervasive pattern of disregard for, and violation of, the rights of others." (See Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (2000 4th rev. ed.), pp. 701–702.) It appears that Judge Nelson intended this meaning when he used the term "psychopath," for he immediately explained: "In other words, you just don't have any kind of human feelings for anybody else." He further explained that it was defendant's cold and calculated crime and his destruction of evidence in the attempted murder trial that had prompted him to label defendant a "dangerous psychopath." Thus, Judge Nelson's use of the term "psychopath" in describing defendant apparently did not indicate a belief, even in 1985, that defendant was psychotic, out of touch with reality, or otherwise unable to understand the proceedings against him.[11]

Defendant also contends that the following additional evidence should have raised a doubt in Judge Nelson's mind regarding defendant's competence: (1) at a time when Judge Stromwall was presiding over the attempted murder case, the Court of Appeal had issued a pretrial ruling finding good cause for a continuance to allow defendant's counsel to investigate the possibility of an insanity defense; (2) in the capital case, Judge Blackwell found that defendant could not read and understand simple English, and Judge Munoz assertedly found he could not understand the saying, "a lawyer who tries his own case has a fool for a client"; and (3) defendant told Judge Munoz that he was unable to get along with the attorneys appointed to represent him. Nothing in the record, however, indicates that Judge Nelson was or should have been aware of these facts at the time he presided over pretrial proceedings in the capital case in 1987. They therefore have no bearing on whether Judge

---

[11] Defendant cites *People v. Rhinehart* (1973) 9 Cal.3d 139 [107 Cal.Rptr. 34, 507 P.2d 642], overruled on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396], and *People v. Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773], disapproved on other grounds in *People v. Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837], for the proposition that the trial court should have declared a doubt concerning defendant's competence to waive counsel. In *People v. Rhinehart, supra,* 9 Cal.3d at pages 149–150, we upheld a trial court's denial of the defendant's request to represent himself on the grounds that (1) the request was premised upon the defendant's belief that there were no competent lawyers in the public defender's office; and (2) the defendant was on the verge of making damaging admissions in open court. In *People v. Teron, supra,* 23 Cal.3d at page 114, we suggested that a court should order a psychiatric examination of a self-represented defendant if there is any indication that the defendant might be mentally ill. Both of these cases were decided before the high court in *Godinez v. Moran, supra,* 509 U.S. at pages 399–400, clarified the standard of competence required in order to waive the right to counsel. *Rhinehart* and *Teron* thus no longer accurately reflect the law.

Nelson should have declared a doubt regarding defendant's competence. (See *People v. Jones* (1991) 53 Cal.3d 1115, 1152 [282 Cal.Rptr. 465, 811 P.2d 757] [due process requires a competency hearing if defendant *presents* substantial evidence of incompetence]; *People v. Castro* (2000) 78 Cal.App.4th 1402, 1415 [93 Cal.Rptr.2d 770] [due process requires competency hearing when trial court becomes aware of substantial evidence of incompetence].)

We also note that defendant overstates what is reflected in the record. After fully exploring a possible insanity defense in the attempted murder case, defendant's counsel informed Judge Stromwall that the insanity issue "is no longer involved in this matter" and stated his belief that there was nothing that would impair defendant from representing himself. Further, although Judge Blackwell denied defendant's request for self-representation on the ground that defendant could not "read or write simple English" (because he did not follow all the instructions in filling out the pro. per. advisement form), that finding appears to be incorrect, in view of defendant's demonstrated ability, which we already have noted, in the preparation of numerous pro se filings. Moreover, Judge Munoz did not find that defendant could not understand the saying about a lawyer trying his own case being a fool. Accordingly, none of these asserted facts compelled the expression of a doubt concerning defendant's competence to waive counsel.

Finally, we note that defendant's advisory counsel did not advise Judge Nelson that defendant's competence might be in issue. In sum, there was no substantial evidence of incompetence requiring Judge Nelson to declare a doubt concerning defendant's competence and to conduct a competency hearing at his capital trial. (See §§ 1367, 1368.)

> b. *Judge Krieger's failure between the guilt and penalty phases to declare a doubt concerning defendant's competence and to conduct a competency hearing*

Defendant's second claim of error is premised upon the failure of the trial judge, Judge Krieger, who had observed defendant's performance at the guilt phase, to declare a doubt concerning defendant's competence when defendant's advisory counsel raised the issue between the guilt and penalty phases.

At an ex parte hearing on May 8, 1989, after the guilt verdict had been rendered but before the penalty phase began, defendant's additional advisory counsel, Lucas, informed the court that the defense was preparing to have a psychiatrist interview defendant. Lucas added that he believed defendant might not be competent to represent himself or to stand trial. The court disagreed: "Having seen [defendant] in the past month and a half, I don't find

that he's incapable of standing trial, at least from a judicial—a psychological lay person's point of view. [¶] He's a lot more competent than most pro. per.'s I've seen." The court refused to find that defendant's decision to represent himself was grounds "per [se] . . . for some type of psychological finding."

The next court day, May 10, 1989, Lucas again raised the issue of defendant's competence to represent himself. Lucas explained that, having observed defendant through the guilt phase, he did not believe that defendant was "competent legally to undertake the representation he's done." When the court asked him to clarify this statement, Lucas replied: "I'm talking about his *legal* competency . . . I'm not saying that he has a mental problem at this point, and I haven't raised that issue." Co-advisory counsel Newman, however, added: "I would be inclined to say that a lot of it is mental, too. I don't think [defendant]—though him and I disagree on that—is mentally competent to represent himself." The court again disagreed with both attorneys, finding defendant possessed a "good grasp of a lot of legal issues" and appeared "mentally stable." Newman observed that there had been "an incarceration of [defendant] at Atascadero State Hospital" and asked the court, over defendant's objection, to declare a doubt as to defendant's competency. The court replied: "I have no doubt as to his competency, his mental capacity and his sanity." Newman then said that over the years he had tried to persuade defendant to be examined by a psychiatrist, but defendant had refused. When the court asked defendant whether he was requesting the appointment of a psychiatrist, defendant stated: "No. I made my position clear . . . to both advisory counsel, that I am not—I'm not raising an incompetency hearing nor an insanity—nor an insanity issue." Defendant reiterated that he wished to represent himself at the penalty phase as well, and that he understood "the drawbacks" of that course of action.

Later that day, during an in camera hearing regarding defense strategy held in the prosecutor's absence, Newman stated for the record that he and Lucas had advised defendant to be examined by a psychiatrist, to consider calling family members or friends as penalty phase witnesses, and to consider introducing his Atascadero State Hospital records, but that defendant had refused to do so. Newman told the court that there were "records from Atascadero State Hospital that I think would have a bearing—I think would have had a bearing also as far as the guilt phase and the penalty phase." Newman said he had long believed "that Mr. Blair might have some mental deficiency that would have been to the benefit at least as to the guilt phase and definitely of some benefit as to the penalty phase." Lucas added that defendant had "spent 95 percent of his time writing writs, writing and thinking writs. He has spent absolutely no significant time in preparation of this case."

Defendant confirmed that he had instructed his advisory attorneys not to contact his family members or friends, that he did not want to introduce the Atascadero records, and that he did not want to put on, in his words, a "diminished capacity or an insanity defense." When the court asked whether there would be any mitigating evidence, defendant stated: "I am not sure. I have to do some research on that, just what is mitigating evidence. It may be my defense will be that the district attorney shouldn't be allowed to put on aggravating evidence. I'm not sure what mitigating evidence would be—there would be. I do know that the—the insanity or diminished capacity is out, and I do know that—that compelling my family members to—to attend is out."

Defendant contends that Judge Krieger had before him substantial evidence that defendant was unable to consult with his lawyers or to rationally understand the nature of the proceedings. Defendant asserts that he did "almost nothing" to prepare for the guilt and penalty phases, prevented his advisory counsel from investigating and presenting mental health evidence, prevented advisory counsel from investigating any kind of mitigating evidence, and spent most of his time researching and writing writs instead of preparing for trial. Defendant contends that these actions were the product of his mental illness and should have alerted the trial court to his possible incompetence. But nothing concerning defendant's failure to prepare indicated that he did not understand the proceedings against him. Further, we have rejected the notion that a defendant's choice not to present a defense, even at the penalty phase, amounts to substantial evidence of incompetence. (*People v. Bradford, supra,* 15 Cal.4th at p. 1373 [defendant's choice not to present a defense at the penalty phase did not compel a doubt as to his competence to stand trial and represent himself].) Defendant further claims the record demonstrates that he did not understand the nature of mitigating evidence. Defendant's technical legal knowledge, however, was irrelevant to the competency inquiry. (See *People v. Bradford, supra,* 15 Cal.4th at p. 1364, citing *Faretta, supra,* 422 U.S. at p. 834.)

Defendant further contends there were other signs of mental illness, which included his hospitalization at Atascadero State Hospital, the irrational nature of the crime, and his insistence on self-representation in this capital case. But we have rejected the notion that the existence of Atascadero records raised a reasonable doubt as to defendant's competence.[12] Further, the circumstance that the crime itself was irrational does not raise a reasonable doubt as to defendant's competence; the same could be said of many murders. Moreover, we agree with the trial judge that the fact that a defendant represents himself or herself cannot be the basis, in itself, "for some type of psychological

---

[12] Defendant contends the trial court was or should have been aware of an additional "history of psychiatric commitments," but we do not find in the record any evidence of hospitalization other than the Atascadero commitment.

finding," because such a rule would require a competency hearing in every case in which a defendant exercises his or her right of self-representation—a standard that neither the high court nor this court has adopted.

Defendant further observes that his advisory counsel expressed doubts concerning defendant's competency. Lucas clarified, however, that he was questioning only defendant's "legal" competency, not any possible "mental problem." Again, defendant's legal knowledge was irrelevant to the competency inquiry. (See *People v. Bradford, supra,* 15 Cal.4th at p. 1364, citing *Faretta, supra,* 422 U.S. at p. 834.) Further, Newman's general opinion that defendant might be incompetent, although relevant, did not compel the court to declare a doubt or to order a competency hearing. (*People v. Welch, supra,* 20 Cal.4th at pp. 738–739, fn. 7; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1112 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Howard* (1992) 1 Cal.4th 1132, 1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Newman did not explain the basis of any belief on his part in defendant's possible incompetence other than to highlight the Atascadero hospitalization, defendant's refusal to be examined by a psychiatrist, and defendant's insistence on remaining in propria persona and filing numerous motions and writs. As we have explained, those circumstances did not compel a doubt concerning defendant's competence. Further, the trial court had ample opportunity to observe defendant personally. (See *People v. Ramos, supra,* 34 Cal.4th at p. 509.)

In sum, whether the facts outlined above are considered separately or cumulatively, "the record in the present case does not indicate that a reasonable doubt existed [or should have existed] as to defendant's ability to understand the proceedings against him." (*People v. Bradford, supra,* 15 Cal.4th at p. 1373.)

Defendant further contends that the court erred in allowing *him* to decide whether or not to request the appointment of a psychiatrist. Defendant, however, was acting as his own attorney. Because the court did not find reason to doubt defendant's competence, it properly deferred to defendant's wishes on that score.

Defendant finally contends that the trial court "utterly failed to follow the requirements" of section 1368 when it failed to appoint counsel for him, to solicit counsel's opinion as to his competence, to order a competency hearing, and to appoint a psychiatrist or psychologist to examine him.[13] Those statutory duties arise, however, only if the court entertains a doubt as

---

[13] Defendant does not contend that, even if a competency hearing was not mandatory under section 1368, the trial court abused its discretion in failing to order such a hearing in the face of the less than substantial evidence casting doubt on defendant's mental competence. (Cf. *People v. Welch, supra,* 20 Cal.4th at p. 742.)

to the defendant's competence. (§ 1368, subd. (a) [requiring the trial judge to declare a doubt concerning the defendant's competence, appoint counsel if the defendant is unrepresented, and solicit counsel's opinion as to competence "[i]f, during the pendency of an action and prior to judgment, *a doubt arises in the mind of the judge* as to the mental competence of the defendant" (italics added)]; *id.*, subd. (b) [requiring the trial judge to order a competency hearing "[i]f counsel [appointed pursuant to subdivision (a)] informs the court that he or she believes the defendant is or may be mentally incompetent"]; § 1369 [outlining the procedure for a hearing ordered under section 1368, including the appointment of a psychiatrist or psychologist to examine the defendant].) Because the court here never entertained or declared such a doubt, it was not obligated to appoint counsel or to take the other steps outlined in sections 1368 and 1369.[14]

### 3. *Asserted ineffective assistance of advisory counsel*

Defendant contends he was deprived of the effective assistance of his advisory counsel in violation of the Sixth Amendment to the United States Constitution, and thus that reversal of the guilt and penalty judgments is warranted.

#### a. *Facts*

As noted above, the master calendar judge, Judge Munoz, appointed Ray Newman as associate counsel and standby counsel on November 4, 1986. Thereafter, Newman appeared in court with defendant during all pretrial proceedings. Between November 1986 and May 1987, defendant, Newman, and the court occasionally referred to Newman as "associate counsel," "cocounsel," or "auxiliary counsel." Newman also filed several motions as attorney for defendant.

In early May 1987, defendant's case was assigned to Judge Nelson. At the May 4, 1987, hearing, the court made clear that it would not permit defendant and Newman to share defendant's representation. On one occasion, when Newman attempted to object to the prosecution's argument regarding a requested continuance, the court cut him off: "First of all, let's remember your status in the case. The defendant is acting in pro. per., as I understand." In response to Newman's explanation that he was "associate" counsel, the court stated: "I don't see how a pro. per. can be chief counsel and . . . have a

---

[14] Defendant contends that the trial court's failure to declare a doubt and order a competency hearing violated his right to a reliable penalty determination under the Eighth Amendment to the United States Constitution. Because defendant does not explain how the analysis of his Eighth Amendment claim differs from his due process claim, we reject the claim for the same reasons that we rejected the due process claim.

lawyer in effect representing him. . . . I'm not going to permit the defendant to be in pro. per. and in effect represented before the court by a lawyer. If he's going to be in pro. per., he's going to be in pro. per. ¶ If the defendant wants to be represented by a lawyer, he has that right. If the defendant wants to go in pro. per., he has that right. I see nothing wrong with having a lawyer assist the defendant in a death penalty case, but I'm not going to have a pro. per. in effect being represented by a lawyer in these proceedings. ¶ Make the choice. Does he want to be represented by an attorney? If that's the case, fine; I'll appoint you counsel, Mr. Newman, and you can go ahead and represent the defendant. If he wants to be pro. per., you may remain as advisory counsel, but you won't be co-counsel to a pro. per." After more discussion, the court addressed defendant: "Now, make a decision, Mr. Blair. Do you want to represent yourself? If so, fine. You may have an advisory counsel. If you want to have Mr. Newman represent you, you may not be pro. per. And we'll go from there. . . . So let's make a decision, Mr. Blair. . . . Do you want to be pro. per., or do you want a lawyer representing you?" Defendant responded: "I'm pro. per." The court replied: "All right. Then, Mr. Newman, you may remain as advisory counsel." At another hearing a few weeks later, Judge Nelson reiterated that Newman was not defendant's attorney, and directed Newman to "let the defendant represent himself in pro. per., please."

Judge Nelson remained assigned to this case until some time later that summer, when another judge was assigned. After that time, the court, the prosecutor, and the defense resumed occasionally referring to Newman as "associate counsel." Subsequently, the case was assigned to Judge Candace Cooper in January 1988. Judge Cooper initially expressed some confusion concerning Newman's status. For example, on February 26, 1988, she said to Newman: "I'm not sure if it's cocounsel or advisory counsel [capacity] that you are working in." Then again on January 10, 1989, she asked Newman "is it advisory or cocounsel technically?" Newman responded: "It's been both. I'm not sure which one." At all times, however, Judge Cooper made clear that defendant was his own attorney. For example, on March 11, 1988, she stated: "Mr. Blair, you are your own counsel in this matter. You have cocounsel with you." And again, on January 10, 1989, she said: "Nonetheless, Mr. Blair is pro. per. I expect this matter to move along."

Finally, on March 6, 1989, Judge Cooper denied a further continuance that defendant had requested based on Newman's involvement in another trial. In defendant's presence, the court addressed Newman: "I understand that. You are, however, advisory counsel, not trial counsel. Mr. Blair can try this matter. He has been pro. per. and advisory counsel is not standby counsel. It is not backup counsel. It is advisory counsel." When Newman again began to argue

in favor of a continuance, Judge Cooper stated: "Mr. Newman, with all due respect, you keep talking like you are going to try this case [but] you are advisory counsel."

Ultimately, the parties appeared for trial on March 17, 1989. Judge Cooper was unavailable, so the case was assigned to Judge Krieger. Because Newman was involved in another capital trial, the court agreed to continue the matter for a few days to allow Newman to locate additional advisory counsel. The court, however, denied a lengthy continuance, reasoning that defendant, not Newman, was counsel of record. The court reiterated to defendant, "You're still pro. per. status. He [Newman] is only advising." The court also indicated it would grant a continuance if defendant gave up his in propria persona status, but defendant refused. The court explained to defendant: "Well, it seems to me that with your pro. per. status then you're not engaged in another trial. If you relinquished your pro. per. status and Mr. Newman were your attorney of record, then the attorney of record is engaged in another trial or will be and, therefore, there is that distinction to be made."

A few days later, the court appointed Lonzo Lucas as additional advisory counsel. The court later denied a 60-day continuance to allow Lucas to familiarize himself with the case, reasoning that defendant, as counsel, was prepared to try the case.

Jury selection began on March 22, 1989. Thereafter, either Newman or Lucas, or both, was present in court on each trial day, except during jury deliberations when counsel were on call. The court ruled that only defendant would be allowed to address the court when the jury was present, and told prospective jurors that defendant was representing himself "assisted" by Lucas and Newman.

Upon defendant's request, the court permitted Newman to deliver defendant's guilt phase closing argument, but only after defendant expressly waived "any objection to any change in tactics or emphasis" that Newman might make. Again upon defendant's request, and after defendant again waived his right to object to any change in tactics, defendant's additional advisory counsel, Lucas, presented the defense penalty phase closing argument. Lucas also argued the automatic motion to modify the verdict.

b. *Discussion*

■ Under the Sixth Amendment, "[d]efendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate and amounted to a denial of effective assistance of counsel. [Citation.] This rule applies whether or not the

self-represented defendant has been assisted by an attorney acting as advisory counsel or in some other limited capacity. [Citations.]" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1226 [259 Cal.Rptr. 669, 774 P.2d 698]; accord, *People v. Pinholster* (1992) 1 Cal.4th 865, 930 [4 Cal.Rptr.2d 765, 824 P.2d 571].) "While the Sixth Amendment guarantees both the right to self-representation and the right to representation by counsel . . . a defendant who elects self-representation 'does not have a constitutional right to choreograph special appearances by counsel' (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 104 S.Ct. 944]). Thus none of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed." (*People v. Bloom, supra,* 48 Cal.3d at p. 1218; accord, *People v. Stewart, supra,* 33 Cal.4th at pp. 518–519; *People v. Bradford, supra,* 15 Cal.4th at p. 1368.)

■ Accordingly, "[t]o prevail on a claim that counsel acting in an advisory or other limited capacity has rendered ineffective assistance, a self-represented defendant must show that counsel failed to perform competently *within the limited scope of the duties assigned to or assumed by counsel* [citations], and that a more favorable verdict was reasonably probable in the absence of counsel's failings [citations]. A self-represented defendant may not claim ineffective assistance on account of counsel's omission to perform an act within the scope of duties the defendant voluntarily undertook to perform . . . at trial." (*People v. Bloom, supra,* 48 Cal.3d at pp. 1226–1227, italics in original.) However, "[a]s to those aspects of the representation over which counsel retains control, counsel remains responsible for providing constitutionally effective representation, and the defendant may assert a claim of ineffective assistance of counsel." (*People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Defendant contends that Newman was effectively "associate counsel" until the eve of trial when, on March 6, 1989, the court denied the defense request for a continuance based on Newman's involvement in another trial. Defendant argues that forcing him to go to trial without Newman's assistance was analogous to removing a represented defendant's chosen attorney on the eve of trial in violation of the Sixth Amendment right to counsel. We disagree.

■ "[T]he powers and responsibilities which attend the representation of a criminally accused person should never be conferred jointly and equally on the accused and the attorney. Rather, in all cases of shared or divided representation, either the accused or the attorney must be in charge. Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once." (*People v. Bloom, supra,* 48 Cal.3d at pp. 1218–1219; accord,

*People v. Stewart, supra,* 33 Cal.4th at p. 518; *People v. Bradford, supra,* 15 Cal.4th at p. 1368.) Responsibility for clarifying the record in this regard rests with the trial court.

Here, the record unfortunately reflects some initial confusion as to the scope of Newman's role when the court first appointed him in November 1986, because the court used both the term "associate counsel" and the term "standby counsel." Any initial confusion was dispelled, however, in May 1987, when Judge Nelson clarified that the court would not permit defendant and Newman to share defendant's legal representation, and that Newman was solely advisory counsel. The record suggests that defendant understood the limits of advisory counsel's role, because in arguing for a continuance based on Newman's unavailability, defendant cited *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994], in which we explained that advisory counsel acts as an advisor or consultant only.

Thus, from May 1987 forward, the record reflects no reasonable basis for defendant to have believed that he would not be expected to try the case himself. Although various judges may have expressed confusion concerning Newman's status, at each point it was made clear that defendant alone was counsel of record. As early as March 11, 1988, more than a year before the trial began, Judge Cooper emphasized that defendant was his own counsel and was therefore responsible for determining which defense motions to bring. On January 10, 1989, she reiterated that she expected the case to "move along" despite Newman's possible unavailability, because "Mr. Blair is pro. per." And Judge Krieger, who presided over the actual trial, made it crystal clear that defendant was in charge. Judge Krieger gave defendant the option of relinquishing his in propria persona status in exchange for a continuance to allow Newman to assume defendant's representation, but defendant refused.

That the court granted several continuances based on Newman's unavailability is not inconsistent with a proper understanding of Newman's limited role as advisory counsel. Before delivering the guilt phase closing argument, Newman confirmed that defendant had been in charge of trial strategy all along and that Newman, as advisory counsel, had not had the power to subpoena witnesses or to tell defendant which witnesses to call. Thus, there is no merit in defendant's contention that he somehow was deprived of appointed counsel at the last minute.

Defendant contends that even if Newman was solely advisory counsel, he performed incompetently "within the limited scope of the duties" he had assumed. (*People v. Bloom, supra,* 48 Cal.3d at p. 1226, italics omitted.) Below we address each of defendant's contentions that either Newman or defendant's additional advisory counsel, Lucas, performed incompetently.

### i. *Newman's absence from the trial*

Defendant contends that Newman could not possibly have rendered effective assistance, because he was absent from the courtroom for more than half of the trial. We disagree. We never have held that advisory counsel must be present during the entire trial. In any event, here defendant had the assistance of additional advisory counsel, Lucas, at trial; the court appointed Lucas as additional advisory counsel specifically to assume Newman's role in Newman's absence. Lucas was present on each of the days that Newman was not, and defendant points to nothing in Lucas's representation on those days that was not competent.

Relying upon *State v. Parson* (Minn.Ct.App. 1990) 457 N.W.2d 261, 263, defendant contends that advisory counsel at a minimum should be present in court during the trial. That case, however, dealt with standby counsel, not advisory counsel. The two roles are distinct. "Standby counsel" is an attorney appointed for the benefit of the court whose responsibility is to step in and represent the defendant if that should become necessary because, for example, the defendant's in propria persona status is revoked. (*People v. Clark* (1992) 3 Cal.4th 41, 149 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730].) "Advisory counsel," by contrast, is appointed to assist the self-represented defendant if and when the defendant requests help. (*People v. Hamilton, supra,* 48 Cal.3d at p. 1164, fn. 14; see also *Littlefield v. Superior Court* (1993) 18 Cal.App.4th 856, 858 [22 Cal.Rptr.2d 659]; *People v. Kurbegovic* (1982) 138 Cal.App.3d 731, 757 [188 Cal.Rptr. 268].) Here, whatever Newman's status when he initially was appointed, the court subsequently made clear that he was solely advisory counsel. As such, there was no requirement that he be present at each court session, particularly because additional advisory counsel Lucas was present when Newman was not.

Defendant next contends that "it was Newman's job to prepare the defense experts for trial," yet Newman did so ineffectively, with the result that "the defense that was supposed to be asserted, that the cause of death was not the cyanide but some other intervening cause, was never presented." In this regard, defendant observes that Judge Krieger denied defendant's request to instruct the jury on "intervening cause" because there was no evidence presented to support that instruction.

We first note that nothing in the record supports defendant's contention that Newman assumed full responsibility for preparing defense experts. Even assuming he had done so, defendant's claim would fail. Defendant contends in effect that Newman failed to meet in advance with the defense experts—Dr. Latif and Dr. Itabashi—and failed to provide them with sufficient information to testify effectively for the defense.

██ "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) "Because claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been, raised on appeal [citations] would not bar an ineffective assistance claim on habeas corpus." (*Id.* at pp. 266–267.)

Here, the record on appeal does not explain why Newman prepared the experts as he did, and there could be a satisfactory explanation for Newman's conduct. For example, Newman's failure to give Dr. Itabashi any of Green's medical records to review before testifying could have been a deliberate defense strategy to keep Dr. Itabashi in the dark about defendant's case so that he could testify only about a hypothetical situation. In any event, defendant does not demonstrate that he was prejudiced by any failure to prepare the experts. The jury was instructed that a proximate cause of death is "a cause which, in the natural and continuous sequence, produces death and without which the death would not have occurred." Defendant does not explain how, even had the defense experts been better prepared, they could have persuaded the jury that the cyanide given to Green was not a proximate cause of her death.

Defendant also contends that Newman's absence from the trial made it impossible for him to give a "coherent" guilt phase closing argument. Because defendant expressly waived any objection to Newman's closing argument, we decline to reach this claim. In any event, we would find the claim meritless. We note that Newman had available the daily trial transcripts for preparation of his argument. Although Newman's argument elicited objections from the prosecution for misstating evidence, on the whole Newman presented a coherent argument based upon an effort to persuade the jury to find a reasonable doubt that defendant could have placed cyanide in a sealed gin bottle or that Green died of cyanide poisoning.[15]

## ii. *Newman's failure to keep confidential the appointment of Dr. Root*

Defendant next contends that, in seeking the appointment of Dr. Root as the defense pathologist, Newman failed to follow the procedures set forth in

---

[15] Defendant also complains that Newman apologized to the jury for having been absent during the trial. We find nothing unreasonable or prejudicial in Newman's acknowledging to the jury that he had been absent.

section 987.9, which allow the defense to apply to the court on a confidential basis for funds for the payment of experts. Defendant contends that Newman's failures in this regard permitted the prosecution to learn of Dr. Root's unfavorable conclusions and to call him as a rebuttal witness at the guilt phase, with devastating results.

At the time of defendant's trial, section 987.9 provided, as it does today in subdivision (a), that "the fact that an application [by an indigent defendant for reasonably necessary funds for the payment of experts] has been made shall be confidential and the contents of the application shall be confidential." The confidentiality provision evidently was intended to prevent the prosecution from anticipating defense strategy. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1132 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Despite the existence of this confidentiality provision, Newman requested the appointment of Dr. Root in open court in the presence of the prosecutor, who informed the defense and the court that he knew Dr. Root on a social basis and had called him as a witness several times. Newman also filed an unsealed, written motion requesting the appointment of Dr. Root. After the defense had presented its case-in-chief, however, Newman informed the court that the defense would not be calling Dr. Root. The prosecutor then stated: "Dr. Root is here. The defense told Dr. Root to leave. But I had a chance to talk to Dr. Root briefly, and I intend to call Dr. Root." Dr. Root then testified in the prosecution's rebuttal case that, contrary to the defense position, cyanide poisoning caused the brain damage and pneumonia that led to Green's death. Newman later informed the court that he had advised defendant against calling Dr. Root to testify, but defendant had subpoenaed him anyway.

The record does not reflect whether Newman had a tactical basis for declining to keep Dr. Root's appointment confidential, and it would be proper for us to reject defendant's contention on this basis. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266–267.)

In any event, defendant fails to establish that the failure to keep Dr. Root's appointment confidential prejudiced him. It was defendant's own choice to subpoena Dr. Root against Newman's advice, and it was that subpoena that brought Dr. Root to court and resulted in the prosecutor's interview with him. Moreover, even had the prosecutor never learned of Dr. Root's opinion concerning defendant's case and never called him to testify, it is not reasonably probable that the outcome of the guilt phase would have been different. (See *People v. Bloom, supra,* 48 Cal.3d at pp. 1226–1227.) The prosecution presented the testimony of Green's treating physician, Dr. Becker, who testified that cyanide poisoning caused her brain damage and resulting

complications. Dr. Gray, who had performed the autopsy on Green, testified that Green died of pneumonia, a complication of the brain damage caused by the cyanide poisoning. The testimony of defendant's own experts was not to the contrary. Dr. Latif agreed with Dr. Becker concerning the cause of Green's condition, and Dr. Itabashi could not say what had caused Green's death. Under these circumstances, it does not appear that a more favorable result was reasonably probable had Dr. Root not testified that cyanide poisoning caused Green's death.[16]

### iii. *Lucas's asserted ignorance about the case*

Defendant next contends that Lucas, who was appointed the day before jury selection began, "knew nothing about the case or the defense." Defendant points to various instances in the record in which Lucas professed his ignorance about the case or acknowledged his lack of preparation. For example, after the guilt verdict was rendered, Lucas admitted to the court that he was unprepared to handle the penalty phase because he "came in on this train when it was already moving."

We decline to presume that Lucas was ineffective merely because he was appointed as additional advisory counsel one day before jury selection began. To establish ineffectiveness, defendant must point to specific acts within the scope of the duties assumed by Lucas that both amounted to deficient performance and resulted in prejudice to defendant's case. (*People v. Bloom, supra,* 48 Cal.3d at p. 1226.) Defendant does not identify any such specific act or failure to act. Defendant complains that Lucas did not conduct any penalty phase investigation, but there is no showing that defendant assigned, or that Lucas assumed, responsibility for that function. Indeed, the record is to the contrary: defendant was in charge of strategy at the penalty phase, and defendant prevented his advisory attorneys from sending the defense investigator to interview defendant's family members and other potential mitigation witnesses. Defendant also complains that Lucas began his penalty phase closing argument by reminding the jurors that they had not "heard from" him yet, and told the jury that he would not "beg and plead for mercy and pity and sympathy" for defendant. Because defendant waived any objection to Lucas's handling of the closing argument, this claim is waived. In any event, no prejudicial deficient performance appears to have taken place. (See *People v. Bloom, supra,* 48 Cal.3d at pp. 1226–1227.)

---

[16] Defendant does not claim on appeal that permitting Dr. Root to testify on behalf of the prosecution violated the work product rule. In any event, any such claim would appear to have been forfeited due to defendant's failure to object to Dr. Root's testimony on this ground. (See *People v. Combs* (2004) 34 Cal.4th 821, 863–864 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

### iv. *Counsel's failure to present evidence regarding defendant's incompetence to stand trial*

Defendant next contends that Newman and Lucas both failed to present to the court evidence in their possession that would have raised a doubt concerning defendant's competence to stand trial. As noted above, during hearings held on May 8 and 10, 1989, outside the presence of the jurors and the prosecutor, defendant's advisory counsel Newman and Lucas expressed their belief that defendant might not be competent to waive counsel or to represent himself, and mentioned the existence of records from defendant's confinement at Atascadero State Hospital in 1972. Nonetheless, neither Newman nor Lucas submitted to the court any records or other evidence to substantiate these claims.

The record reflects that defendant did not want to be examined by a psychiatrist and prevented his advisory attorneys from investigating a mental state defense. Further, in response to the court's question whether defendant wanted the court to appoint a psychiatrist to examine him, defendant specifically stated that he was "not raising [*sic*] an incompetency hearing." Assuming for the sake of argument that it is within advisory counsel's role to bring to the court's attention evidence in support of a finding of incompetence even over a self-represented defendant's objection, on the present record we discern no prejudice from advisory counsel's failure to do so. The Atascadero records are not before us in the record on appeal. We thus have no way to determine whether those records would have caused the trial court to declare a doubt concerning defendant's competence to stand trial or to waive counsel. Accordingly, we reject defendant's contention.

### 4. *Asserted denial of access to ancillary defense resources*

Defendant claims a violation of his Fourteenth Amendment right to equal protection of the laws, his Sixth Amendment right to self-representation, and his Fifth and Fourteenth Amendment rights to due process of law and a fair trial, due to the trial court's alleged denial of reasonable ancillary defense resources such as investigators, experts, and legal materials.

### a. *Facts*

At defendant's first appearance in the superior court on October 21, 1986, he requested $2,500 for an investigator and for travel and supplies. Judge Munoz denied that request but ordered that defendant be provided with the "normal" indigent funds and supplies. The court also agreed to appoint an investigator from the superior court panel, but defendant did not select an investigator at that time.

At defendant's November 4, 1986, arraignment, Judge Munoz appointed Donna Brooks as defendant's legal "runner"—that is, an individual designated to make deliveries to and from the court on defendant's behalf. The court also ordered $40 in in propria persona funds placed in defendant's inmate account, as well as $50 for his runner at $5 per visit.

In late January 1987 defendant filed a motion to suppress evidence, asserting that Detective Jackson's search of defendant's briefcase and wallet in 1984 was unreasonable. The hearing on this motion was continued numerous times until it was finally heard in April 1989. In the meantime, on March 4, 1987, Judge Roger Boren, to whom the case had been assigned, ordered a reporter's transcript of the attempted murder trial delivered to defendant for his use in preparing for the hearing on the motion to suppress. At an ex parte hearing held in early April, Judge Boren ordered certain legal and medical books and articles provided to defendant. On April 24, 1987, defendant's advisory counsel, Newman, stated that defendant was having difficulty accessing his in propria persona and investigation funds. Judge Boren issued an order clarifying that defendant was to receive a total of $40 for telephone and stamps, payable at $10 per week, as well as "those supplies regularly and normally . . . provided without cost to other persons who are in propria persona." The order allowed defendant to direct any request for additional funds or supplies to the court.

On May 4, 1987, defendant advised Judge Nelson, to whom the case recently had been transferred, that he recently had received the transcript of the attempted murder trial. When defendant complained a few days later in the master calendar court about the $40 limit on in propria persona funds, Judge Munoz explained that the $40 was intended only to cover incidental expenses, and stated: "If you need experts, you will get experts, pay them just like we do with other attorneys."

On June 10, 1987, on defendant's motion, Judge Munoz appointed Robert Sabel as defendant's investigator and issued an order authorizing payment "not to exceed $3,000 without further order of court."

Between July 1987 and February 1988, the case was continued several times and was reassigned to Judge Candace Cooper. During that period, defendant moved for an order to preserve tissue samples taken from Green's organs after her death, for examination by a defense pathologist. The prosecutor agreed to have the samples sent from Michigan, where Green had died, to the coroner's office in Los Angeles. Upon defendant's request, the court ordered the reporter's transcript of the May 31, 1985, proceedings in the attempted murder trial prepared and filed. The court denied, however, defendant's request for additional legal books and other materials.

At a hearing held on March 11, 1988, Judge Cooper at defendant's request appointed Dr. Irving Root as the defense expert pathologist. The court later signed an order authorizing payment of up to $3,000 for Dr. Root's services. The court also promised to look into the matter of the May 31, 1985, transcript, which had not been prepared as ordered.

In June 1988 the parties agreed to continue the trial until January 1989, in part because Dr. Root had not yet examined Green's tissue samples. On July 8, 1988, the parties appeared before Judge Cooper for a hearing on defendant's discovery motion. Defendant asked for a copy of any fingerprint analysis conducted by the prosecution on the gin bottle and the box it came in, and asked that the bottle and box be released to a defense fingerprint expert. Defendant also complained that a page was missing from the defense copy of the "murder book" (the district attorney's collection of relevant police reports), which had been turned over to defendant in March of 1987. The missing page documented the death of Michelle Dubois, the woman Rhoda Miller had visited on the day of the poisoning. Defendant suggested that the district attorney or his agents might have taken the page from his cell during a search. Judge Cooper declined to inquire into the legality of any searches of defendant's cell, but stated she would order the prosecutor to deliver to the defense a new copy of the page involving Dubois, as well as any prosecution fingerprint analysis of the gin bottle and box.

After another continuance, on March 16, 1989, the court set this matter for trial the next day. Because Judge Cooper was unavailable, the case was reassigned to Judge Krieger.

On March 17, 1989, before Judge Krieger, the prosecutor agreed to arrange for the defense expert, Dell Freeman, to examine the gin bottle, the box it came in, and other relevant items. When defendant complained that he had not received the missing page from the murder book, the court stated that Judge Cooper's order regarding the page was still in effect, and that the prosecutor would turn it over to defendant if and when it was found.

Jury selection began on March 22, 1989. Later that day, Judge Krieger appointed Malcolm Everest as defendant's replacement investigator after defendant explained that his previous investigator, Robert Sabel, had resigned. The court's order provided funds of up to $1,500 for Everest's services.

During jury selection on March 30, Judge Krieger formalized the appointment of Dell Freeman as defendant's fingerprint expert. The prosecutor stated that the gin box and bottle would be available for Freeman to examine at the Los Angeles Police Department.

At defendant's request, on April 6, 1989, Judge Krieger relieved Everest as defendant's replacement investigator and appointed Malcolm Richards in his place. The funding limit remained $1,500. On April 7 and 10, 1989, during jury selection, Lucas informed the court that he had been unable to contact Richards.

Judge Krieger heard and denied defendant's suppression motion on April 17, 1989. The parties presented opening statements and the prosecution began its case-in-chief that same day. The next day, defendant again complained that the defense had been unable to contact his replacement investigator, Richards. The court ordered Richards to appear in court on April 20 to meet with defendant.

The prosecution rested its case-in-chief on April 24, 1989. Dell Freeman testified for defendant the following day. Ultimately, defendant declined to call Dr. Root, but the prosecution called him on April 28, 1989, in its rebuttal case. Dr. Root testified that Green died from cyanide poisoning.

Between October 1987 and July 1988, defendant's initial investigator, Robert Sabel, submitted four fee statements seeking reimbursement for a total of $4,426.57 for 177 hours worked, plus expenses. On each statement, defendant acknowledged that he had requested all of the services performed. Neither of defendant's subsequent two defense investigators (Everest or Richards) submitted billing statements.

### b. *Discussion*

Defendant contends that the equal protection clause of the Fourteenth Amendment to the United States Constitution demands "parity" between the ancillary services provided to an indigent defendant who represents himself or herself and an indigent defendant represented by counsel. Defendant contends that parity was denied to him and that his Fourteenth Amendment rights therefore were violated. Defendant asserts that even if parity is not required, the alleged denial of ancillary services violated his Sixth Amendment right to represent himself and his Fifth and Fourteenth Amendment rights to due process of law and a fair trial.

Our analysis begins with a discussion of the constitutional and statutory bases of a criminal defendant's right to ancillary defense services. "[T]he right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary defense services. [Citations.]" (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320 [204 Cal.Rptr. 165, 682 P.2d 360], fns. omitted.) Section 987.9 codifies this right

in capital cases. (*County of Los Angeles v. Commission on State Mandates* (1995) 32 Cal.App.4th 805, 815 [38 Cal.Rptr.2d 304].) At the relevant time (1987 through 1989), that statute provided, as it does today, in pertinent part: "In the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense." (Former § 987.9, now § 987.9, subd. (a).)

As section 987.9 makes clear, the right to ancillary services arises only when a defendant demonstrates such funds are "reasonably necessary" for his or her defense by reference to the general lines of inquiry that he or she wishes to pursue. (*Corenevsky v. Superior Court, supra,* 36 Cal.3d at p. 320.) This requirement applies both to indigent defendants represented by counsel and to those who choose to represent themselves. (See *People v. Faxel* (1979) 91 Cal.App.3d 327, 330–331 [154 Cal.Rptr. 132] [interpreting the analogous provision for noncapital cases, section 987.2].) The court held in *Faxel* that the "necessary parity between the indigent defendant and others" required by the equal protection clause "is to be achieved not by permitting the indigent to spend public funds at his whim but rather by administration" of the reasonable necessity requirement. (*Faxel, supra,* at p. 331.) Assuming the equal protection clause also demands parity between the services provided to indigent defendants represented by counsel and those provided to individuals representing themselves, such parity is to be achieved in the same manner.

As for the Sixth Amendment, we have recognized that depriving a self-represented defendant of "all means of presenting a defense" violates the right of self-representation. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1040, citing *Milton v. Morris* (9th Cir. 1985) 767 F.2d 1443, 1445–1446.) Thus, "a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense." (*People v. Jenkins, supra,* 22 Cal.4th at p. 1040.) Yet, as we have observed, "[i]nstitutional and security concerns of pretrial detention facilities may be considered in determining what means will be accorded to the defendant to prepare his or her defense. [Citations.] When the defendant has a lawyer acting as advisory counsel, his or her rights are adequately protected. [Citations.]" (*Ibid.*) In the final analysis, the Sixth Amendment requires only that a self-represented defendant's access to the resources necessary to present a defense be reasonable under all the circumstances. (See *People v. Jenkins, supra,* 22 Cal.4th at pp. 1040–1041.)

Thus, the crucial question underlying all of defendant's constitutional claims is whether he had reasonable access to the ancillary services that were reasonably necessary for his defense. A review of the record reveals that he did. Defendant had advisory counsel Newman and Lucas acting on his behalf, so his Sixth Amendment rights were adequately protected. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1040.) Moreover, defendant received the services of several investigators, a runner, a pathologist, and a fingerprint expert. Although defendant complains that the services provided were not used effectively, any failure to utilize those resources better is attributable to defendant who, as his own counsel, controlled the litigation. Defendant cannot premise a claim of ineffective assistance of counsel on his own shortcomings. (*Faretta, supra,* 422 U.S. at pp. 834–835, fn. 46.) As discussed below, none of defendant's specific claims regarding the resources provided to him has merit.

Defendant first complains that he was restricted to a total of $40 for "legal resources" pursuant to a Los Angeles County Superior Court policy. But as noted above, the trial court explained that sum was intended only for incidental expenses such as telephone calls and stamps, and defendant was free to ask for additional funding for such expenses if he needed it. Defendant also challenges the sufficiency of the budget of $50 for a "runner" at $5 per visit. He makes no showing, however, that this budget was inadequate. Further, although defendant complained occasionally concerning his inability to access the funds in his inmate account, he makes no showing that the funds were not ultimately made available, or that he suffered prejudice from any temporary lack of access.

Defendant also asserts he was denied reasonable access to an investigator. He is incorrect. Although the court initially denied defendant's October 21, 1986, request for $2,500 for an investigator and other expenses, it informed defendant at the time that an investigator would be appointed from the approved panel as soon as defendant sought one. Defendant did not formally request appointment of an investigator until June 10, 1987, at which time the court immediately appointed Robert Sabel.[17] Sabel worked a total of 177 hours on defendant's case and apparently resigned some time after July 1988, but defendant did not request appointment of a replacement investigator until March 22, 1989, at which time the court appointed Malcolm Everest and, thereafter, Malcolm Richards. Although defendant complains of difficulty in contacting Richards during the trial, as noted above the record reflects that when defendant brought this matter to the court's attention, the court ordered

---

[17] It appears that prior to June 1987 defendant experienced difficulty locating an investigator willing to work on the case because, although the court had "allocated" funds, the county had not "released" them. We discern no prejudice from any delay in the appointment of an investigator.

Richards to appear in court to meet with defendant. There is no indication in the record that this order was not complied with.

Defendant further asserts that Sabel interviewed only one witness during the entire time he worked for defendant and spent most of his time preparing and filing writ petitions. This, however, apparently was how defendant chose to use his investigator. Defendant acknowledged requesting all of the services performed by Sabel. He cannot premise a claim of error upon his own failings as counsel. (*Faretta, supra,* 422 U.S. at pp. 834–835, fn. 46.)

Defendant next complains he was denied access to expert witnesses. Again, he is mistaken. The court appointed Dr. Irving Root as defendant's expert pathologist immediately upon defendant's formal request. The prosecution made Green's tissue samples available for Dr. Root to examine. That Dr. Root's conclusions were not favorable to the defense, and that he ultimately did not testify on defendant's behalf, is immaterial; defendant was given access to and funding for the expert he chose, which is all that the law requires. The court also appointed Dell Freeman as defendant's fingerprint expert, and the prosecution made the gin bottle, box, and wrapping available for Freeman to examine. Freeman subsequently testified favorably for the defense. Although Freeman may not have been appointed as expeditiously as defendant would have liked, defendant has not established prejudice from any delay.

Defendant next contends that his access to documents and discovery materials was inadequate. He observes that it took more than a year for the transcript of the attempted murder trial to be delivered to him. Defendant first requested the transcript on March 4, 1987. The bulk of the transcript was delivered by May 1987. Although the record does not reflect the precise date on which defendant received the final portion of the transcript—that portion reporting the May 31, 1985, proceedings—it is reasonable to assume that he received that material shortly after his last request for it on March 11, 1988, well before the start of jury selection in March 1989 and the suppression hearing the following month. No prejudice appears from any delay in the completion and delivery of the transcript. Defendant also contends he never received the missing page from the murder book involving Michelle Dubois. The court did indicate it would order a copy of that page delivered to defendant, but it apparently never issued a formal order, and the prosecution later disputed that any order existed. Even assuming the prosecution should have supplied defendant with a copy of the missing page, defendant was not prejudiced. The page apparently documented the fact that Dubois had died, something the prosecution brought out at trial. We fail to see how such information would have assisted the defense.

Defendant further asserts he was denied access to the courts. Defendant complained on occasion that he was unable to send or receive legal mail. The court resolved this problem in part, however, by having defendant's mail delivered through the court or through defendant's advisory counsel. The record does not support defendant's further contention that he was unable to file writ petitions with the appellate courts.

Defendant finally asserts he was denied access to legal resources such as books and periodicals. The record belies this assertion. On at least one occasion, the court ordered certain legal and medical books and articles that were not available in the prison law library delivered to defendant. The court denied defendant's request for additional materials, because defendant had access to the law library, advisory counsel, and a "runner" who could make copies for defendant of materials that were unavailable in the prison law library. Defendant thus makes no showing he was denied any reasonably necessary legal resources.

In sum, defendant had access not only to advisory counsel Newman and Lucas, but also to investigators, experts, a runner, and library and other resources. To the extent defendant may have been denied access to any resources, the denial was minimal and defendant has failed to demonstrate any resulting prejudice. Defendant thus has not established any violation of his Sixth Amendment right to self-representation or his Fourteenth Amendment right to equal protection of the laws.[18]

### 5. *Existence of a right to self-representation at the penalty phase*

As noted above, after the jury returned its guilt verdict a dispute arose between defendant and advisory counsel concerning the presentation of evidence in mitigation. Advisory counsel wanted defendant to be examined by a psychiatrist, to present available testimony from family members, and to introduce into evidence available medical, prison, and psychiatric records. Defendant, however, rejected the advice of his advisory counsel. Ultimately, defendant presented no penalty phase witnesses and introduced only his transcripts from Los Angeles City College as evidence in mitigation.

Defendant contends the trial court erred in allowing him to represent himself at the penalty phase because, defendant asserts, the Sixth Amendment right to self-representation does not extend to the penalty phase of a capital trial. He contends the alleged error deprived him of his right to counsel under the Sixth Amendment to the federal constitution. We consistently have held,

---

[18] Defendant also claims the denial of resources violated his Fifth and Fourteenth Amendment rights to due process of law and a fair trial. We reject these claims for the same reasons we reject his Sixth Amendment and equal protection claims.

however, that the Sixth Amendment right to self-representation extends to the penalty phase. (E.g., *People v. Koontz, supra,* 27 Cal.4th at p. 1074; *People v. Bradford, supra,* 15 Cal.4th at pp. 1364-65; *People v. Clark* (1990) 50 Cal.3d 583, 617–618 [268 Cal.Rptr. 399, 789 P.2d 127].)

In the alternative, defendant argues that permitting him to preclude any investigation and presentation of mitigating evidence at the penalty phase violated his right to a reliable penalty determination under the Eighth Amendment to the federal Constitution. We have rejected this contention as well. (*People v. Bloom, supra,* 48 Cal.3d at pp. 1227–1228.) As we have explained, a rule requiring a pro se defendant to present mitigating evidence would be unenforceable and self-defeating. (*Ibid.*; see also *People v. Koontz, supra,* 27 Cal.4th at pp. 1073–1074; *People v. Bradford, supra,* 15 Cal.4th at pp. 1364–1365.)

Defendant contends that the United States Supreme Court's decision in *Martinez v. Superior Court* (2000) 528 U.S. 152 [145 L.Ed.2d 597, 120 S.Ct. 684] (*Martinez*) undermines these conclusions. The high court in *Martinez* addressed whether the right to self-representation extends to the appeal of a criminal conviction. The high court first noted that Sixth Amendment rights are trial rights that do not apply to an appeal, which is not constitutionally compelled but is purely a "creature of statute." Accordingly, any right to self-representation on appeal must be grounded in the due process clause. (528 U.S. at pp. 159–161.) The court in *Martinez* then proceeded to reason that because the status of the accused "changes dramatically" after he or she is found guilty—from a presumptively innocent defendant who is "haled into" court by the state, to one found guilty beyond a reasonable doubt who initiates the appeal to attack the conviction—states are free on appeal to conclude that the defendant's autonomy interests no longer outweigh the state's interests in the integrity and efficiency of the proceedings. (*Id.* at pp. 161–163.) Thus, there is no constitutional right to self-representation on appeal. (*Id.* at pp. 163–164.)

Defendant contends that the rationale of *Martinez* compels the conclusion that there is no right to self-representation at the penalty phase, because (1) the penalty phase of a capital trial, like an appeal, is a "creature of statute," and (2) at the penalty phase, as on appeal, the defendant has been found guilty beyond a reasonable doubt and thus his autonomy interests are sufficiently diminished to be overridden by the state's interests in a fair and reliable penalty determination.

We are not persuaded. First, as we have explained, for Sixth Amendment purposes the penalty phase of a capital case is " 'merely a stage in a unitary capital trial.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 194 [5

Cal.Rptr.2d 796, 825 P.2d 781], quoting *People v. Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].) For this reason, Sixth Amendment rights, including the right to the assistance of counsel, apply at the penalty stage. (See *Gardner v. Florida* (1977) 430 U.S. 349, 358 [51 L.Ed.2d 393, 97 S.Ct. 1197]; *Mempa v. Rhay* (1967) 389 U.S. 128, 134, 137 [19 L.Ed.2d 336, 88 S.Ct. 254].) Accordingly, the correlative right to self-representation applies as well, regardless of whether the existence of the penalty phase is a statutory creation or is itself compelled by the federal Constitution. Second, although the decision in *Martinez* speaks of the diminution of a defendant's autonomy interests after conviction and on appeal, *Martinez* does not address the level of autonomy interest enjoyed by a defendant during sentencing. We find nothing in *Martinez* to persuade us that a defendant's autonomy interests are any less compelling at the penalty phase of a capital trial than at the guilt phase. The defendant at sentencing is still in the position of being "haled into court" by the state (see *Faretta, supra,* 422 U.S. at p. 807), and thus still has an interest in personally presenting his or her defense. (See *id.* at p. 819.)

 Defendant cites a number of cases from other states holding that Eighth Amendment reliability interests trump a defendant's right to control the defense at the penalty phase of a capital trial.[19] We do not find these cases persuasive. Rather, we adhere to the weight of state and federal authority that concludes, consistent with our own precedent, that the Sixth Amendment right to self-representation extends to the penalty phase, and that the Eighth Amendment poses no barrier to the self-represented defendant's control of the presentation of mitigating evidence. (E.g., *United States v. Davis* (5th Cir. 2002) 285 F.3d 378, 384–385 [the right to self-representation extends to the penalty phase of a capital case; the appointment of an independent counsel to present mitigating evidence against the defendant's wishes violated that right]; *Silagy v. Peters* (7th Cir. 1990) 905 F.2d 986, 1006–1008 [the right to self-representation applies to the penalty phase of a capital case even if the

---

[19] (E.g., *Muhammad v. State* (Fla. 2001) 782 So.2d 343, 361–365 [trial court erred by giving "great weight" to advisory jury's recommendation to impose the death penalty when that jury had not heard any mitigating evidence; in future cases in which the defendant does not challenge the imposition of the death penalty, the trial court must order the preparation of a presentence report discussing mitigating factors]; *Morrison v. State* (1988) 258 Ga. 683 [373 S.E.2d 506, 509] [when defendant insisted on a death sentence and prohibited counsel from presenting mitigating evidence, the trial court may have had an obligation "to conduct an independent investigation into the possible existence of evidence in mitigation"]; *State v. Koedatich* (1988) 112 N.J. 225 [548 A.2d 939, 989] [to preserve Eighth Amendment reliability, a represented defendant may not prevent his attorneys from presenting available mitigating evidence]; see also Note, *The Right of Self-Representation in the Capital Case* (1985) 85 Colum. L.Rev. 130, 152–153 [arguing that the Eighth Amendment interest in reliability overrides the right to self-representation at the penalty phase of a capital case, and that the state therefore should appoint counsel to present and argue mitigating evidence if the defendant is unable or unwilling to do so].)

defendant chooses to forgo the presentation of mitigating evidence; the Eighth Amendment is no bar to the imposition of sentence in these circumstances]; *People v. Coleman* (1996) 168 Ill.2d 509 [660 N.E.2d 919, 927–928, 214 Ill.Dec. 212] [*Faretta* applies in capital cases]; *People v. Silagy* (1984) 101 Ill.2d 147 [461 N.E.2d 415, 429–432, 77 Ill.Dec. 792] [the defendant may waive counsel and seek death at the penalty phase of a capital case]; *Smith v. State* (Ind. 1997) 686 N.E.2d 1264, 1274–1276 [appointment of a special counsel to present mitigating evidence over the defendant's objection was not warranted]; *Bridges v. State* (2000) 116 Nev. 752 [6 P.3d 1000, 1012] [self-represented defendant in a capital case is not required to introduce mitigating evidence and may seek the death penalty]; *People v. Gordon* (N.Y.Sup.Ct. 1999) 179 Misc.2d 940, 942–945 [688 N.Y.S.2d 380, 382–384] [*Faretta* extends to a capital case]; *State v. Reed* (1998) 332 S.C. 35 [503 S.E.2d 747, 750] [capital defendant may waive the right to counsel].)[20]

## 6. *Fundamental fairness*

Defendant contends that permitting him to represent himself resulted in a fundamentally unfair trial in violation of his Fourteenth Amendment rights. Defendant argues that the Sixth Amendment right to self-representation is subordinate to the "paramount interest in the rendition of just verdicts in criminal cases" (see *Wheat v. United States* (1988) 486 U.S. 153, 160 [100 L.Ed.2d 140, 108 S.Ct. 1692]), and that when the right to a fair trial conflicts with a defendant's subordinate right to self-representation, the latter right must yield. Here, defendant argues, those rights were in conflict because of the court's decision to allow defendant to represent himself despite his asserted mental illness, and because of the court's asserted denial of resources and assistance necessary to make defendant's right to self-representation meaningful.

Putting aside for the moment the question whether defendant's self-representation actually denied him a fundamentally fair trial, we question defendant's legal premise. Defendant in effect would have us hold that the right to a fair trial can trump the right of self-representation in particular cases. The high court, however, has adhered to the principles of *Faretta* even with the understanding that self-representation more often than not results in detriment to the defendant, if not outright unfairness. (See *Martinez, supra,* 528 U.S. at p. 161 ["Our experience has taught us that 'a pro se defense is usually a bad defense, particularly when compared to a defense provided by

---

[20] Defendant argues that permitting him to represent himself at the penalty phase and to prevent the presentation of mitigating evidence violated his federal constitutional rights to due process of law and a fair trial. Because defendant does not explain how these claims differ from his Sixth Amendment and Eighth Amendment claims, we reject these claims for the same reasons that we reject his claims under the Sixth and Eighth Amendments.

an experienced criminal defense attorney' " (fn. omitted)]; see also *id.* at p. 161, fn. 9 [acknowledging the view of some observers that allowing certain defendants to represent themselves at trial is akin to allowing them to waive their right to a fair trial]; see also *id.* at pp. 164–165 (conc. opn. of Breyer, J.); *McKaskle v. Wiggins, supra,* 465 U.S. at p. 177, fn. 8 ["the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant . . ."]; *Faretta, supra,* 422 U.S. at p. 834 ["It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts"]; see also *ibid.* ["[A]lthough he may conduct his own defense ultimately to his own detriment, his choice must be honored . . ."]; accord, *Godinez v. Moran, supra,* 509 U.S. at p. 400.) Under these circumstances, we are not free to hold that the government's interest in ensuring the fairness and integrity of defendant's trial outweighed defendant's right to self-representation.[21]

In any event, we have examined each of defendant's contentions of unfairness and found that none has merit. As we have explained, defendant knowingly and intelligently waived his right to the assistance of counsel; the trial court did not err in declining to declare a doubt concerning defendant's competence to stand trial or to waive counsel at either the guilt or the penalty phases; defendant received all of the ancillary resources due him; and defendant has not demonstrated on this record that his advisory counsel performed ineffectively. In sum, permitting defendant to represent himself did not result in a fundamentally unfair trial. To the extent defendant claims unfairness on some basis other than these specific alleged grounds, decisions of the United States Supreme Court, as we have explained, fail to support his position.

### B. *Other issues*

#### 1. *Jury selection—failure to remove jurors for cause*

Defendant contends the trial court violated his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution by refusing to excuse for cause three jurors who asserted they always would vote for the death penalty for certain forms of murder.

Defendant challenged Jurors L., Q., and V. for cause after each made conflicting statements concerning whether he or she inevitably would vote for the death penalty for an intentional, deliberate, or premeditated murder. The

---

[21] Neither *Wheat v. United States, supra,* 486 U.S. 153, nor *Estes v. Texas* (1964) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628], upon which defendant relies, involved self-representation.

trial court denied each of these challenges. Defendant used a peremptory challenge to excuse Juror V. from the panel of regular jurors, and used another peremptory challenge to remove Juror Q. from the panel of alternate jurors. Juror L. was excused on other grounds. Defendant used all 20 of his available peremptory challenges to the prospective regular jurors,[22] and also exhausted the peremptory challenges available to him to challenge the prospective alternate jurors.[23]

The due process clause of the Fourteenth Amendment requires the sentencing jury in a capital case to be impartial to the same extent required at the guilt phase. (*Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222]; see also *id.* at p. 740 (dis. opn. of Scalia, J.) [clarifying the constitutional basis of the court's holding]; *People v. Williams* (1997) 16 Cal.4th 635, 666 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Article I, section 16 of the California Constitution provides the same guarantee. (See *People v. Williams, supra,* 16 Cal.4th at pp. 666–667; *People v. Johnson* (1993) 3 Cal.4th 1183, 1210 [14 Cal.Rptr.2d 702, 842 P.2d 1].) To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844], quoting *Adams v. Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 100 S.Ct. 2521]; *People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Under our state law, a defendant who wishes to preserve a claim of error in the improper denial of a challenge for cause must (1) use a peremptory challenge to remove the juror in question; (2) exhaust his or her peremptory challenges or justify the failure to do so; and (3) express dissatisfaction with the jury ultimately selected. (See *People v. Weaver* (2001) 26 Cal.4th 876, 910–911; *People v. Williams, supra,* 16 Cal.4th at p. 667; *People v. Crittenden, supra,* 9 Cal.4th at pp. 120–121.)

Here, defendant used peremptory challenges to remove Jurors V. and Q. and exhausted all of his peremptory challenges in selecting the jurors. He did

---

[22] At the time of defendant's trial, each side in a capital case was allotted 20 peremptory challenges to the regular jurors. (Code Civ. Proc., former § 231.)

[23] At the time of defendant's trial, each side was allotted "as many peremptory challenges to the alternate jurors as there are alternate jurors called." (Code Civ. Proc., former § 234.) Although four alternate jurors were seated, defendant exercised five peremptory challenges. It thus appears that defendant received, and exhausted, more peremptory challenges to the prospective alternate jurors than were due him under state law.

not, however, express dissatisfaction with the jury ultimately seated.[24] We decline, however, to find defendant's claim forfeited on this basis, because "language in past cases suggested that counsel's expression of dissatisfaction with the jury was not always a necessary prerequisite to challenging on appeal a trial court's decision denying a challenge for cause." (*People v. Weaver, supra,* 26 Cal.4th at p. 911; see *People v. Crittenden, supra,* 9 Cal.4th at p. 121, fn. 4; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659].) This case was tried in early 1989, before the law was clarified with respect to the preservation of claims involving the allegedly erroneous denial of challenges for cause. Accordingly, we shall reach the merits of defendant's claim. (See *People v. Boyette* (2002) 29 Cal.4th 381, 416 [127 Cal.Rptr.2d 544, 58 P.3d 391] [declining to find claim of erroneous denial of challenge for cause forfeited, because "the law was in a state of flux on this point at the time of defendant's 1993 trial"].)

 To establish that the erroneous *inclusion* of a juror violated a defendant's right to a fair and impartial jury, the defendant must show either that a biased juror actually sat on the jury that imposed the death sentence, or that the defendant was deprived of a peremptory challenge that he or she would have used to excuse a juror who in the end participated in deciding the case. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 85 [101 L.Ed.2d 80, 108 S.Ct. 2273]; *People v. Williams, supra,* 16 Cal.4th at p. 667; *People v. Crittenden, supra,* 9 Cal.4th at p. 121; *People v. Bittaker, supra,* 48 Cal.3d at pp. 1087–1088.) Here, defendant used peremptory challenges to remove Jurors Q. and V. from the panels of prospective regular and alternate jurors, and Juror L. was excused for other reasons. Accordingly, none of these jurors sat on the jury that ultimately decided defendant's case. Further, defendant does not identify any sitting juror whom he challenged for cause. (See *Ross v. Oklahoma, supra,* 487 U.S. at p. 86; *People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Defendant did file a motion seeking to quash the entire jury panel on the ground that it did not include any jurors from the Hollywood area where the crime was committed. But defendant neither "presses that claim" here, nor "suggests that the absence of [persons residing in Hollywood] was in any way related to the failure to remove [Jurors L., Q., and V.] for cause." (*Ross v. Oklahoma, supra,* 487 U.S. at p. 86.) Defendant thus fails to demonstrate that the jury that tried his case was not impartial. (*Ibid.*) Finally, defendant fails to identify any juror whom he would have excused had he not used his peremptory challenges to remove Jurors V. and Q. (*Ross v. Oklahoma, supra,* 487 U.S. at p. 88; *People v.*

---

[24] Defendant argues that he expressed dissatisfaction with the jury by filing, on March 29, 1989, in the middle of jury selection, a motion to quash the jury panel based on its alleged failure to represent a fair cross-section of the community because none of the prospective jurors resided in the Hollywood community where the crimes occurred. Because we conclude defendant's claim was not forfeited in any event, we decline to address this contention.

*Boyette, supra,* 29 Cal.4th at pp. 418–419; cf. *People v. Williams, supra,* 16 Cal.4th at p. 668.) Accordingly, focusing on the 12 jurors who actually decided defendant's case, as we must (see *Ross v. Oklahoma, supra,* 487 U.S. at p. 86), we conclude that defendant has not established that his right to an impartial jury was violated.

■ In any event, the trial court properly denied each of defendant's challenges for cause. "Applying *Wainwright v. Witt, supra,* 469 U.S. 412, 424 . . . , we have stated that ' "[i]n a capital case, a prospective juror may be excluded if the juror's views on capital punishment would 'prevent or substantially impair' the performance of the juror's duties." [Citations.] "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' [Citation.] In addition, ' "[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." [Citations.]' " (*People v. Jenkins, supra,* 22 Cal.4th at p. 987.)

Here, each of the challenged jurors initially expressed some variation of the view that he or she would vote for the death penalty in all cases of intentional, deliberate, or premeditated murder. Nonetheless, after the trial court and sometimes the prosecutor explained that the death penalty was not mandatory if the defendant was found guilty of murder with special circumstances, but instead that there would be a separate penalty phase at which the parties would have the opportunity to present aggravating and mitigating evidence relevant to punishment, each juror expressed a willingness to consider all of the evidence and both available penalty options before deciding on the appropriate punishment. The record thus supports the trial court's conclusion that none of the challenged jurors held views that would prevent or substantially impair the performance of the juror's duties. (*Wainwright v. Witt, supra,* 469 U.S. at p. 424; *People v. Jenkins, supra,* 22 Cal.4th at p. 987.) At a minimum, because the jurors' statements were ambiguous or conflicting, the trial court's determination of each juror's true state of mind is binding on us. (*People v. Jenkins, supra,* 22 Cal.4th at p. 987.)

Defendant asserts that he "used all of his peremptory challenges to excuse these jurors, leaving him no peremptory challenges when the final juror was seated." To the extent this assertion can be interpreted as a claim that the trial court arbitrarily deprived defendant of peremptory challenges due him under state law in violation of his Fourteenth Amendment right to due process of law (see *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]), this claim must fail. Defendant received and exercised the 20

peremptory challenges allotted to him under state law. (See Code Civ. Proc., § 231.) State law required him to use those peremptories to cure any erroneous denials of challenges for cause. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [270 Cal.Rptr. 451, 792 P.2d 251], overruled on other grounds in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Defendant received all that was due him under state law. (*Ross v. Oklahoma, supra,* 487 U.S. at pp. 88–91; *People v. Gordon, supra,* 50 Cal.3d at p. 1248, fn. 4.)

### 2. *Guilt phase—second degree murder instruction*

Defendant contends the trial court erred by refusing a defense-requested instruction on second degree felony murder.

#### a. *Facts*

At a hearing held to determine which jury instructions would be given, defendant orally requested that the court instruct the jury on second degree felony murder. Defendant did not, however, submit a written proposed instruction. The prosecutor opposed defendant's request, because no underlying felony upon which to base second degree felony murder was charged. Ultimately, the court refused the instruction, stating: "I don't think there's evidence of second degree in this situation. It's—this is or is not [first degree]."

The court instructed the jury by delivering CALJIC Nos. 8.10 (murder defined), 3.31.5 (murder requires the mental state of malice aforethought), 8.11 (malice aforethought defined), 8.23 (murder by poison), 8.80 (special circumstances—introductory), and 8.81.19 (special circumstances—murder by administration of poison). The court further instructed the jury that "poison" means "any substance introduced into the body by any means which by its chemical action is capable of causing death. Cyanide is a poison."

#### b. *Discussion*

 The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [sua sponte duty]; *People v. Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311] [sua sponte duty], overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1] [duty upon

request].) That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. (*People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; see also *People v. Breverman, supra,* 19 Cal.4th at p. 154.) To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist. (*People v. Breverman, supra,* 19 Cal.4th at p. 162; *People v. Wickersham, supra,* 32 Cal.3d at p. 324; *People v. Flannel, supra,* 25 Cal.3d at pp. 684–685.)

 Here, the information charged defendant with the murder of Green by the administration of poison. "All murder which is perpetrated by means of . . . poison . . . is murder of the first degree." ( § 189; see *People v. Catlin* (2001) 26 Cal.4th 81, 149 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Diaz* (1992) 3 Cal.4th 495, 568 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) This rule applies, however, only to *murders*—that is, killings by poison when the killer acts with either express or implied malice. (*People v. Mattison* (1971) 4 Cal.3d 177, 182–184 [93 Cal.Rptr. 185, 481 P.2d 193].) To find express malice, the jury must conclude the defendant intended to kill the victim. To find implied malice, the jury must be satisfied that the defendant "had full knowledge that his conduct endangered the life of decedent, but that he nevertheless deliberately administered the poison with conscious disregard for that life." (*Id.* at pp. 183–184.)

 If a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on a felony murder theory. At the time the poisoning occurred in 1984, section 347 provided (as it does today) in pertinent part: "Every person who willfully mingles any poison or harmful substance with any food, drink, medicine, or pharmaceutical product . . . where the person knows or should have known that the same would be taken by any human being to his or her injury, is guilty of a felony . . . ." (Stats. 1983, ch. 1172, § 7, p. 4448.) When a person violates section 347 and death results either accidentally or negligently, he or she may be guilty of second degree felony murder. (*People v. Mattison, supra,* 4 Cal.3d at pp. 184–186.) The intent required to sustain a conviction for second degree felony murder in this context is not an intent to kill, or a conscious disregard for life, but rather the intent to injure or intoxicate the victim. (*Id.* at p. 186.)

 Second degree murder is a lesser included offense of first degree murder. (*People v. Bradford, supra,* 15 Cal.4th at p. 1344; *People v. Cooper* (1991) 53 Cal.3d 771, 827 [281 Cal.Rptr. 90, 809 P.2d 865].) Thus, even

without a written request, defendant was entitled to an instruction on second degree felony murder if there was evidence from which reasonable jurors could have concluded that defendant intended only to injure Green when he poisoned her.

The bulk of the evidence in this case suggests that defendant acted, at a minimum, with conscious disregard for Green's life. The evidence established that defendant believed Green owed him money. Defendant deliberately obtained cyanide—a highly toxic substance—which he carefully placed in a gin bottle so that the bottle appeared sealed. Defendant then had Miller deliver the bottle to Green. Defendant apparently had been Green's drinking companion and thus would have known that she liked to drink. This course of conduct, including deliberately obtaining a highly toxic substance and concealing its presence in the gin bottle from which he expected Green to drink, evidenced, at a minimum, a conscious disregard for Green's life (as well as the lives of any others who might drink from the gin bottle), if not a specific intent to kill Green.

Defendant contends that there was evidence from which the jury could have concluded that he intended only to injure Green, pointing to evidence suggesting that he expected to see Miller and Dubois again after the poisoning. For example, William Miller testified that when defendant left Dubois's apartment after giving the gin bottle to Rhoda Miller, defendant said he would come by to see Dubois in a day or two. Approximately a week later, the day defendant was arrested, defendant told William Miller that he had come by the apartment complex to see Dubois, and he asked where Rhoda Miller was. Further, the circumstances of defendant's arrest show that he did not expect to be arrested and did not conceal his presence. Finally, Miller became sick but did not die from the poisoning. All of this, defendant argues, suggests he did not expect Green to die.

We disagree that the foregoing constitutes substantial evidence of an intent merely to injure Green. Defendant's comments to Dubois and to William Miller about returning to see Dubois shed little light on defendant's intent with regard to Green. Indeed, they suggest either a continuing pattern of concealment or complete ignorance of what had happened to Green and Miller, rather than an intent to injure. Defendant's inquiry regarding Miller's whereabouts is equally consistent with an attempt to determine whether or not she was dead as with an expectation to see her alive. We note that defendant did not inquire about Green. Further, what happened to Miller *after* defendant poisoned her sheds little light on the intent with which he acted.

Defendant contends that the evidence of a motive to kill—consisting solely of Murphy's testimony that defendant said he wanted to "get" Green because

of some financial dispute—was weak. He contends that the weak evidence of motive supports an inference that he did not intend to kill Green. We disagree. The jury properly was instructed that "[m]otive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." Thus, the jury was free to disregard the evidence of motive in determining defendant's intent. Further, we conclude that the absence of strong evidence of motive did not constitute substantial evidence that defendant intended merely to injure Green. Because there was no substantial evidence that defendant intended merely to injure Green, the trial court did not err in declining to instruct the jury as to second degree murder.

Additionally, even if we were to conclude that such an instruction was required, its omission would have been harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392], citing *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) Here, the court instructed the jury that to find true the special circumstance of murder by the administration of poison, it had to find that each of the following facts was proved: "1. *The killing was intentional*; and 2. Defendant committed the murder by the administration of poison." Thus, in finding the special circumstance of murder by the administration of poison to be true, the jury necessarily found that defendant intended to kill Green when he poisoned her. Any failure to properly instruct on second degree felony murder therefore would have been harmless. (See *People v. Lewis, supra*, 25 Cal.4th at p. 646.)

### 3. *Penalty phase—asserted erroneous admission of evidence*

Defendant contends that the trial court erred by admitting, at the penalty phase, the testimony of his former chemistry instructor, Emily Maverick, assertedly in violation of his rights under state law and to due process of law, a fair trial, and a reliable penalty phase determination under the Eighth and Fourteenth Amendments to the United States Constitution.

#### a. *Facts*

On April 27, 1989, near the end of the guilt phase of the trial, the prosecutor informed the court and counsel that he had subpoenaed defendant's academic records from Los Angeles City College. The records showed

that defendant had taken chemistry courses there shortly before Green was poisoned. The prosecutor said he was considering calling a chemistry instructor as a witness in rebuttal at the guilt phase, but he did not do so.

At a May 8 hearing held between the guilt and the penalty phases, the prosecutor announced his intention to call Emily Maverick to testify that defendant had conducted an experiment with cyanide in one of her classes in the early 1980's. The prosecutor said he had just identified and spoken with Maverick the previous Friday. Defendant objected that the testimony was irrelevant and also that he had not received proper notice of the prosecutor's intent to present that evidence. The prosecutor argued that the evidence was relevant to the circumstances of both the crime and the special circumstance, in that it showed that defendant was "familiar with the murder weapon." The trial court overruled defendant's objections, stating: "no notice need be given if [the testimony] is connected to the current offense." Because the defense was asking for a continuance on other grounds, however, the court granted a one-week continuance "in an overabundance of caution."

Just before Maverick was scheduled to testify, the defense on May 15, 1989, objected to her testimony as outside the scope of section 190.3, factor (a), in that it did not relate to the "circumstances of the offense." The court disagreed. Defendant then offered to stipulate "that he knows the effects of cyanide and that he knows some of the chemical reactions involving cyanide," but apparently defendant did not follow up on this proposal.

Maverick testified that defendant had been a student in two of her chemistry classes at Los Angeles City College in 1982. In the organic chemistry class, defendant chose to conduct an experiment that involved dissolving cyanide in water in order to enlarge an organic molecule by adding a carbon atom. Maverick tried to discourage defendant from conducting this experiment, because of the hazardous nature of cyanide, but ultimately she gave her approval. She explained to defendant that cyanide was extremely toxic and taught him to handle it safely. In the course of the experiment, defendant weighed, handled, and moved the cyanide. On cross-examination, Maverick stated that defendant did a "good job" with the experiment and that he had been a chemistry tutor.

During penalty phase closing arguments, the prosecutor argued that defendant's experience in Maverick's chemistry class made his crime "all the more heinous" because he had "take[n] that knowledge and ability and do[ne] to Dorothy Green what was done to her in this case."

b. *Discussion*

Under section 190.3, factor (a), the trier of fact may consider, in aggravation, evidence relevant to "the circumstances of the crime of which

the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." The "circumstances of the crime" as used in section 190.3, factor (a), "does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to '[t]hat which surrounds materially, morally, or logically' the crime." (*People v. Edwards, supra,* 54 Cal.3d at p. 833, quoting 3 Oxford English Dict. (2d ed. 1989) p. 240 [evidence that the police had conducted a massive search for defendant for several days after the killings was relevant and admissible under section 190.3 because it showed that defendant had the presence of mind to elude capture].)

Defendant contends that Maverick's testimony should have been excluded because it was irrelevant to any aggravating circumstance. Specifically, he argues that the testimony was not admissible under section 190.3, factor (a), as a circumstance of the crime of which he was convicted or of the special circumstance which the jury found true. We disagree. Maverick's testimony was relevant because it tended to demonstrate that defendant was peculiarly interested in cyanide and familiar with its dangerous properties. As such, it established both that defendant could have been the individual who placed the cyanide in the gin bottle given to Miller and Green, and that defendant was aware that inserting cyanide into the gin bottle could cause their deaths. The evidence thus came within the set of facts that " 'surround[ed] materially, morally, or logically' the crime" (*People v. Edwards, supra,* 54 Cal.3d at p. 833), and was admissible under section 190.3, factor (a).[25]

Defendant contends that we have placed limitations on defendants who seek to introduce, at the penalty phase, evidence relevant to issues of guilt or innocence, and that parallel limitations should be imposed on prosecution evidence. Relying on *People v. Miller* (1990) 50 Cal.3d 954 [269 Cal.Rptr. 492, 790 P.2d 1289], defendant argues that Maverick's testimony did not fall within factor (a) of section 190.3, because it went squarely to defendant's guilt.

In *Miller,* the defendant was convicted of four counts of first degree murder and four counts of attempted murder and was sentenced to death. On appeal, the defendant contended that the trial court had erred in excluding, at the penalty phase, evidence that one of the attempted murder victims, while under hypnosis, had identified someone else as his possible attacker.

---

[25] Relying on Justice Mosk's concurring and dissenting opinion in *People v. Bacigalupo* (1993) 6 Cal.4th 457, at page 492, footnote 2 [24 Cal.Rptr. 808, 862 P.2d 808], defendant argues that we have overruled "sub silentio" *Edwards's* expansive interpretation of section 190.3, factor (a). A majority of the court never has endorsed this view, however, and we decline to do so now. Defendant further argues that *Edwards's* expansive interpretation of factor (a) renders it unconstitutionally vague. We address this argument below.

(*People v. Miller, supra,* 50 Cal.3d at p. 1005.) The defendant claimed the evidence was admissible at the penalty phase as a mitigating " 'circum-stance[] of the offense.' " (*Ibid.*) We rejected the defendant's claim, because the trial court already had found the same evidence unreliable and on that basis had refused to admit it at the guilt phase. (*Ibid.*) We stated: "[The victim's] pretrial statements are not 'circumstances of the offense,' but rather, as defendant would have us find, indicia of innocence. Thus they bear not on aggravation versus mitigation, but on conviction versus acquittal. In essence, defendant contends he should have been allowed to relitigate his guilt during the penalty phase; indeed, he frankly admits that the sole purpose of introducing the statements at the penalty phase would have been to raise doubts about his guilt on the . . . attempted murder count. The court, however, had already found the statements unreliable for that purpose during the guilt phase. We must uphold such findings when, as here, they are supported by substantial evidence." (*Ibid.*)

Subsequent cases have agreed that evidence proffered on the issue of lingering doubt may be excluded because the evidence in question is other-wise inadmissible as hearsay or is unreliable. (*People v. Kaurish* (1990) 52 Cal.3d 648, 704 [276 Cal.Rptr. 788, 802 P.2d 278].) Evidence such as prior plea negotiations, or the asserted misconduct of a prosecutor who interviewed a prosecution witness who did not testify, may be excluded as not relevant to the defendant's guilt or innocence. (*People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

We reject defendant's reliance upon *People v. Miller, supra,* 50 Cal.3d 954, because we do not read that decision as precluding the introduction of any and all evidence relevant to guilt or innocence at the penalty phase. Indeed, in many circumstances evidence related to guilt or innocence, and properly designed to raise a lingering doubt, will be relevant and admissible.[26] (See, e.g., *People v. Jones* (2003) 30 Cal.4th 1084, 1125 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1193–1194 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Hawkins* (1995) 10 Cal.4th 920, 966–967 [42 Cal.Rptr.2d 636, 897 P.2d 574], overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666]; *People v. Cox* (1991) 53 Cal.3d 618, 675–677 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Terry* (1964) 61 Cal.2d 137, 145–148 [37 Cal.Rptr. 605, 390 P.2d 381], overruled on other grounds in *People v. Laino* (2004) 32 Cal.4th 878, 893 [11 Cal.Rptr.3d 723, 87 P.3d 27]; but see *In re Gay* (1998)

---

[26] We note that the United States Supreme Court recently granted certiorari in an Oregon case to decide whether the Eighth Amendment requires that the defendant be permitted to present evidence related to his or her guilt or innocence at the penalty phase of a capital case. (*State v. Guzek* (2004) 336 Or. 424 [86 P.3d 1106], cert. granted Apr. 25, 2005, No. 04-928, 544 U.S. 998 [125 S.Ct. 1929, 161 L.Ed. 2d 771].)

19 Cal.4th 771, 814 [80 Cal.Rptr.2d 765, 968 P.2d 476].) Rather, *Miller* simply held that the trial court correctly ruled inadmissible at the penalty phase evidence it had found *unreliable* at the guilt phase. (*People v. Miller, supra,* 50 Cal.3d at p. 1005.) Defendant does not contend that Maverick's testimony was unreliable. Accordingly, *Miller* does not govern the present case.

Here, Maverick's testimony was not introduced solely to reinforce the jury's conclusion that defendant was guilty of murder and that the alleged special circumstance was true. The evidence established not only defendant's ability to handle cyanide and his awareness of its hazardous nature, but also demonstrated that defendant had misused his educational opportunities for the nefarious purpose of poisoning Green and Miller. Accordingly, the evidence was relevant not only to defendant's guilt, but also to the reprehensibility of his conduct, a "circumstance of the offense" under factor (a) of section 190.3. Because the evidence was otherwise admissible under factor (a) to prove a circumstance of the offense, it was not rendered inadmissible simply because it also tended to prove defendant's guilt.[27]

Defendant asserts that even if Maverick's testimony fell within the scope of factor (a) of section 190.3, the trial court should have excluded it because the prosecution failed to provide proper notice of its intent to present that evidence. Section 190.3 requires the prosecution to give notice to the defense of aggravating evidence it intends to introduce at the penalty phase "within a reasonable period of time as determined by the court, prior to trial." (*Id.*, 4th par.) The purpose of the notice requirement is to allow the defendant sufficient opportunity to prepare a defense to the aggravating evidence. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1070 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

▮▮▮ Assuming the notice requirement applied to Maverick's testimony (but see § 190.3, 4th par. [notice provision inapplicable to "evidence *in proof of* the offense or special circumstances which subject a defendant to the death penalty" (italics added)]), the trial court was not required to exclude this evidence. "We have construed the phrase 'prior to trial' [in section 190.3] to mean before the cause is called to trial. [Citation.] We also have held that where the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. [Citation.] Under

---

[27] Defendant contends the trial court erred in failing to accept his offer to stipulate that he knew the effects of cyanide. But it appears that defendant failed to follow up on this offer after the court gave him an opportunity to do so. In any event, the trial court would have been justified in rejecting this offer, because it did not convey the detail and depth of the information contained in Maverick's testimony.

such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to meet that evidence. If the prosecution's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence. [Citations.]" (*People v. Mitcham, supra,* 1 Cal.4th at p. 1070.)

Here, it is undisputed that the prosecution did not provide defendant with notice of its intent to introduce the Maverick testimony "before the cause [was] called to trial." Rather, the prosecutor on April 27, 1989, near the end of the guilt phase, first notified the defense that it might attempt to contact defendant's chemistry instructor and first notified the defense—on May 8, 1989, between the guilt and penalty phases—that it intended to call Maverick as a witness. The prosecutor did, however, give the defense "prompt notice" of the testimony once it was discovered. At that point, although the court found the testimony was not subject to section 190.3's notice requirement, it granted a one-week continuance of the penalty phase in order to allow the defense additional time to prepare for other aspects of the penalty phase. Defendant does not contend that this continuance was insufficient to allow him to prepare a defense to Maverick's testimony. Defendant had ample time to have his investigator meet with Maverick and to prepare his cross-examination. Because defendant does not demonstrate that he was prejudiced by any delay in giving notice, the trial court's refusal to exclude this testimony was not error.[28]

### 4. *Penalty phase—constitutionality of the death penalty statute*

Defendant argues that the California death penalty statute under which his sentence was imposed violates several provisions of the federal Constitution. As he acknowledges, we have in the past rejected many of these same arguments, and we decline to revisit those holdings here. Specifically, we have held that section 190.2—setting out the special circumstances that, if found true, render a defendant eligible for the death penalty—adequately narrows the category of death-eligible defendants in conformity with the requirements of the Eighth and Fourteenth Amendments (*People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Arias* (1996) 13 Cal.4th 92, 186–187 [51 Cal.Rptr.2d 770, 913 P.2d 980]), and that section 190.3, factor (a)—designating the circumstances of the crime as a factor the jury may consider in assessing the appropriate penalty—is not impermissibly vague and does not allow for arbitrary and capricious sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution (*People v. Seaton* (2001) 26 Cal.4th 598, 691 [110

---

[28] Because defendant does not explain how his federal constitutional claims differ from his claim under state law, we reject them for the same reasons we reject his state law claim.

Cal.Rptr.2d 441, 28 P.3d 175], citing *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Lucero* (2000) 23 Cal.4th 692, 727 [97 Cal.Rptr.2d 871, 3 P.3d 248]).

 Further, we have concluded that California's death penalty statute is not lacking in the procedural safeguards necessary to protect against arbitrary and capricious sentencing under the Eighth and Fourteenth Amendments. Specifically, neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. (*People v. Griffin* (2004) 33 Cal.4th 536, 593–594 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777–779 [230 Cal.Rptr. 667, 726 P.2d 113].) Indeed, the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase. (*People v. Carpenter* (1997) 15 Cal.4th 312, 417–418 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Holt* (1997) 15 Cal.4th 619, 682–684 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors. (*People v. Griffin, supra,* 33 Cal.4th at pp. 593–594; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 777–779.) There is no requirement under the Eighth or Fourteenth Amendments that a jury find the existence of unadjudicated criminal activity under section 190.3, factor (b), unanimously or beyond a reasonable doubt. (*People v. Payton* (1992) 3 Cal.4th 1050, 1068 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People v. Gordon, supra,* 50 Cal.3d at p. 1273.) Even if there were such a requirement, defendant would not benefit from it, because no evidence of unadjudicated criminal acts was presented at the penalty phase of his trial. Nor do the United States Supreme Court's recent decisions interpreting the Sixth Amendment's guarantee of a jury trial (*Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) compel a different result. (*People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. Griffin, supra,* 33 Cal.4th at pp. 594–595; *People v. Prieto* (2003) 30 Cal.4th 226, 262–265 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Ochoa* (2001) 26 Cal.4th 398, 452–454 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

 We further have held that intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution. (*People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347].) The use of adjectives such as "extreme" and "substantial" in section 190.3 penalty

factors (d) and (g) does not impermissibly restrict the jury's consideration of mitigating evidence in violation of the Eighth or Fourteenth Amendments. (*People v. Arias, supra,* 13 Cal.4th at pp. 188–189; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146].) The failure to instruct the jury that some section 190.3 penalty factors (factors (d), (e), (f), (g), (h), and (j)) may be considered only in mitigation does not violate the Eighth or Fourteenth Amendments. (*People v. Osband* (1996) 13 Cal.4th 622, 705 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Arias, supra,* 13 Cal.4th at pp. 187–188.)

 Additionally, as defendant acknowledges, we have rejected the notion that in view of the availability of certain procedural safeguards such as intercase proportionality review in noncapital cases, the denial of those same protections in capital cases violates equal protection principles under the Fourteenth Amendment. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1182 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Cox, supra,* 53 Cal.3d at p. 691; *People v. Allen* (1986) 42 Cal.3d 1222, 1287–1288 [232 Cal.Rptr. 849, 729 P.2d 115].) As we have observed, capital case sentencing involves considerations wholly different from those involved in ordinary criminal sentencing. (*People v. Danielson* (1992) 3 Cal.4th 691, 719–720 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) By parity of reasoning, the availability of procedural protections such as jury unanimity or written factual findings in noncapital cases does not signify that California's death penalty statute violates equal protection principles.

 Defendant finally argues that the use of capital punishment as an assertedly "regular" form of punishment for substantial numbers of crimes, rather than as an extraordinary punishment for extraordinary crimes such as treason, violates international norms of human decency. This in turn, he argues, renders the death penalty as practiced in the United States violative of the "evolving standards of decency that mark the progress of a maturing society" (*Trop v. Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 78 S.Ct. 590] (plur. opn.)) under the cruel and unusual punishment clause of the Eighth Amendment. We disagree. As the United States Supreme Court recently explained, although international authorities and norms are relevant to the consideration whether a punishment is cruel and unusual under the Eighth Amendment, they are not controlling. (*Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183, 1198]; see also *id.* at pp. 603–605 [125 S.Ct. at pp. 1215–1216] (dis. opn. of O'Connor, J.).) Eighth Amendment analysis instead hinges upon whether there is a national consensus in this country against a particular punishment. (*Roper v. Simmons, supra,* 543 U.S.

at pp. 562–567[125 S.Ct. at pp. 1191–1194].) Defendant makes no claim that there exists a national consensus against the use of the death penalty as currently employed.

■ Defendant also contends that the death penalty as an assertedly "regular" form of punishment violates the law of nations and is therefore unconstitutional "inasmuch as international law is a part of our law." Defendant does not demonstrate, however, that the death penalty as applied in California violates international law. To the contrary, " '[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*People v. Brown* (2004) 33 Cal.4th 382, 404 [15 Cal.Rptr.3d 624, 93 P.3d 244], quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Because we find no state or federal constitutional or statutory defect compelling reversal of defendant's conviction or sentence, this claim must fail.

### 5. *Assertedly excessive appellate delay*

Defendant contends that the delay in processing this appeal, particularly the eight years between the time that appellate counsel was appointed in 1991 and the record was certified in 1999, denied him his right to due process of law under the Fourteenth Amendment. In support of a claimed right to a speedy appeal, defendant relies primarily on federal lower court decisions. (*Harris v. Champion* (10th Cir. 1994) 15 F.3d 1538, 1558; *Burkett v. Fulcomer* (3d Cir. 1991) 951 F.2d 1431, 1445; *Coe v. Thurman* (9th Cir. 1990) 922 F.2d 528, 530–531; *United States v. Antoine* (9th Cir. 1990) 906 F.2d 1379, 1382; *Dozie v. Cady* (7th Cir. 1970) 430 F.2d 637, 638; *Snyder v. Kelly* (W.D.N.Y. 1991) 769 F.Supp. 108, 111, affd. *Snyder v. Kelly* (2d Cir. 1992) 972 F.2d 1328.) As we have explained in rejecting similar claims: "None of those decisions address the unique demands of appellate representation in capital cases. [¶] Neither this court, nor the United States Supreme Court, has extended the Sixth Amendment right to speedy trial to appeals in the manner suggested by defendant. Assuming, but not deciding, that such a right exists, defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants." (*People v. Holt, supra,* 15 Cal.4th at p. 709 [three-year delay in appointment of appellate counsel did not deny due process]; accord, *People v. Welch, supra,* 20 Cal.4th at pp. 775–776 [nearly three-year delay in appointment of appellate counsel did not deny due process].)

■ Defendant asserts that *Holt* and *Welch* involved delay in the appointment of counsel, whereas his claim addresses primarily the eight-year delay

in certifying the appellate record. But we have rejected the contention that delays in record certification deny due process. (*People v. Seaton, supra,* 26 Cal.4th at p. 702 [delays in appointment of counsel and in securing an adequate appellate record did not deny due process in a capital murder case].) "A defendant in a criminal case is entitled to an appellate record adequate to permit 'meaningful appellate review.' " (*Id.* at p. 699, quoting *People v. Scott* (1997) 15 Cal.4th 1188, 1203 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Defendant fails to demonstrate that the process by which California certifies the record on appeal as accurate and complete is not necessary to ensure that each capital appellant receives a thorough and careful review of his or her claims on appeal.

█ Even were we to assume that the delay in this appeal was somehow "inordinate" (see *Harris v. Champion, supra,* 15 F.3d at pp. 1552–1553) for a case of this nature, defendant concedes that on the record before this court, "prejudice is indeed difficult to specify." As the Ninth Circuit Court of Appeals has observed in litigation involving this same defendant, a court evaluating a claimed denial of due process due to appellate delay must determine what effect, if any, the delay in processing the defendant's appeal may have had on efforts to overturn his conviction or sentence. (*Blair v. Woodford* (9th Cir. 2003) 319 F.3d 1087, 1088.) Defendant contends that during his incarceration on death row, his mental health has deteriorated to the point that he is unable to assist appellate or habeas corpus counsel and will be unfit to stand trial should a retrial be ordered. With respect to the appeal, however, which is the only proceeding that concerns us at this juncture, defendant has failed to connect his alleged mental deficiency to any inability of his appellate counsel to present his claims on appeal.[29] (Cf. *People v. Kelly* (1992) 1 Cal.4th 495, 546 [3 Cal.Rptr.2d 677, 822 P.2d 385] [because the issues on appeal are limited to the appellate record, the appeal may proceed despite defendant's incompetence].) Accordingly, defendant has failed to demonstrate that any delay prejudiced his ability to obtain meaningful appellate review.[30]

---

[29] Defendant asserts he will offer additional evidence of the prejudice resulting from the delay, in his yet-to-be-filed petition for writ of habeas corpus, and requests that we consider the issue of appellate delay in conjunction with that evidence. Pursuant to our established policy, we decline to do so. We shall consider the issue raised on appeal based solely upon the appellate record.

[30] Defendant also contends that the delay violated his right to equal protection of the laws under the Fourteenth Amendment. Because defendant does not explain how the analysis of this claim differs from his due process claim, this claim must fail for the same reasons.

### III. Disposition

For the foregoing reasons, we affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.